**NATIONAL WESTERN LIFE INSURANCE CO.,**
**Plaintiff,**

v.

**MERRILL LYNCH, PIERCE, FENNER AND SMITH, INC., Defendant.**

**No. 93 CIV. 7244(VM).**

United States District Court,
S.D. New York.

July 29, 2002.

See also 112 F.Supp.2d 292.

Benjamin Zelermyer, Serchuk & Zeler-myer, White Plains, NY, Andrew J. Mytel-ka, Galveston, TX, for plaintiff.

Grant Aram Hannessian, Baker & McKenzie, New York City, for defendant.

## DECISION AND ORDER

MARRERO, District Judge.

TABLE OF CONTENTS

I.   INTRODUCTION ................................................ 334

II.  STANDARD OF REVIEW ......................................... 334

III. FACTS AND PROCEDURAL HISTORY ............................... 335
     A.  THE FUNDAMENTALS OF COOPERATIVES, COOPERATIVE
         FINANCING AND THE PROPOSED INVESTMENT .................. 336
     B.  NATIONAL WESTERN'S INVESTMENT EXPERIENCE AND THE
         1988 CHARMS TRANSACTION ............................... 340
     C.  THE TRANSACTION, NATIONAL WESTERN'S INTERNAL
         DELIBERATIONS AND THE AGREEMENT ....................... 341
     D.  THE ADMISSIBILITY OF RELATED DISCOVERY AND TRANSAC-
         TION DOCUMENTS ........................................ 343
         1.  The Howard Notes .................................. 343
         2.  The D & P Rating .................................. 345
         3.  The Appraisal ..................................... 347
     E.  NATIONAL WESTERN'S RECEIPT OF THE NOTICES OF THE
         COOPERATIVE'S DEFAULT ................................. 348

IV.  THE APPLICABILITY OF THE STATUTE OF LIMITATIONS TO
     NATIONAL WESTERN'S TSA CLAIM .............................. 349

V.   NATIONAL WESTERN'S COMMON LAW FRAUD CLAIM ................. 356
     A.  NATIONAL WESTERN WAS A SOPHISTICATED INVESTOR ......... 358
     B.  AS A SOPHISTICATED INVESTOR, NATIONAL WESTERN
         KNEW, OR SHOULD HAVE KNOWN, THAT THE SPONSOR'S
         ABILITY TO MEET ITS OBLIGATIONS WAS SUBSTANTIALLY
         DEPENDENT ON SALES OF APARTMENT UNITS ................. 360

1. The CHARMS Documents .......................................... 361
2. The D & P Rating ............................................... 364
3. National's Western's Own Deliberations ............................ 365

VI. CONCLUSION AND ORDER ......................................... 367

## I. INTRODUCTION

The case before the Court has the dubious distinction of approaching its tenth year of litigation. National Western Life Insurance Co. ("National Western") commenced the present action in May 1993 against Merrill Lynch, Pierce, Fenner and Smith, Inc. ("Merrill Lynch") asserting violations of the Texas Securities Act (the "TSA") and common law arising out of National Western's investment in a real estate loan financed by Merrill Lynch. Since then, the case passed through the dockets of four district judges, first in Texas, where it originated, and then in New York, where it was transferred, before finally settling down in this Court. On August 16, 2000, after seven years of the parties' protracted pretrial wrangling, the Court ruled on Merrill Lynch's motion to dismiss the complaint, or in the alternative for summary judgment.[1] On the record of the pleadings then before it, the Court dismissed certain claims while permitting National Western to proceed with discovery on others, in particular the causes of action under the TSA and for common law fraud relating to its allegations that Merrill Lynch had failed to provide certain material information pertaining to the loan transaction at issue. Discovery, as it is designed to do, has put National Western's allegations to the test, placing them in the real life context in which they arose. Upon the conclusion of discovery, Merrill Lynch moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure on the balance of National Western's claims.

For the reasons set forth below, the Court finds no genuine issues of material fact that warrant extending this dispute into its tenth year of litigation. Merrill Lynch's motion for summary judgment is granted.

## II. STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994). In considering the motion, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Gallo*, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record supporting a genuine issue as to any material fact. *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

If, however, a moving party satisfies its burden under Rule 56(c), it is incumbent on the opponent to produce sufficient evidence of genuine, triable issues supported with specific facts as set forth in Rule

---

**1.** The Court's Decision is reported as *National Western Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 112 F.Supp.2d 292 (S.D.N.Y.2000) (the "Decision" or *"National Western I "*).

56(e). In this regard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). Furthermore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (citations omitted).

## III. *FACTS AND PROCEDURAL HISTORY*

The present dispute arose out of National Western's purchase in March of 1989 of a sub-participation interest in a loan provided to a New York City residential cooperative corporation. The loan was made contemporaneous with the property owner's conversion of the residential portion of the building into a cooperative. In the Decision, the Court performed a comprehensive review of the factual background, the investment at issue and the parties' contentions. *See National Western I,* 112 F.Supp.2d at 296–98. That review, however, occurred in the factual vacuum confined to the pleadings and related material, as provided for under Federal Rule of Civil Procedure 12(b)(6). The Court was obliged to accept all well-pleaded allegations in the complaint as true and to draw all reasonable inferences in favor of National Western. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982);

*National Western I,* 112 F.Supp.2d at 298–99.

Even within this limited universe of facts, the Court found that National Western had failed to state claims entitling it to relief on its allegations of fraud pursuant to Article 581–33(A)(2) of the TSA and Texas common law relating to the valuations of the Property. *See National Western I,* 112 F.Supp.2d at 314, 318. On related grounds, the Court dismissed National Western's claim of negligent misrepresentation. *See id.* at 319. As to National Western's claim of breach of fiduciary duty, the Court granted Merrill Lynch's alternative motion for summary judgment, finding that the claim was barred by the applicable two-year statute of limitations. *See id.* at 323.

Nevertheless, drawing all reasonable inferences in favor of National Western, the Court sustained its claims under the TSA and for common law fraud, as they pertained to the alleged failure of Merrill Lynch to provide material information about the financial condition of the sponsor of the cooperative (the "Sponsor"). *See id.* Those two remaining claims are the subject of the present motion.

Discovery, however, has provided the parties an opportunity to explore these remaining allegations in their proper context—the actual circumstances and events surrounding National Western's investment. Outside of the factual vacuum, National Western's allegations take on entirely different meanings, augmented by what happened before, during and after the consummation of the transaction. Thus, although the Court has previously produced a comprehensive summary of the facts from the pleadings, another similarly detailed assessment of the fuller record is necessary for purposes of the present motion.

## A. THE FUNDAMENTALS OF COOPERATIVES, COOPERATIVE FINANCING AND THE PROPOSED INVESTMENT

A review of the basic principles governing real estate cooperatives and cooperative financing is essential to an understanding and proper resolution of the issues raised by the present motion. As the Court's analysis below demonstrates, certain pertinent documents exchanged by the parties in connection with the relevant transactions provided National Western with a clear explanation of these underlying principles.

Cooperative apartments are a form of residential property ownership found predominantly in the northeastern United States, particularly in New York City.[2] In a residential cooperative, a corporation assumes ownership of an apartment building, and the current tenants may participate in that ownership, along with non-tenant buyers, by purchasing shares of the corporation corresponding to their particular residential units. The shareholders' right of occupancy is subject to a proprietary lease, a variant of the typical apartment lease with some similar provisions. Their right of occupancy is evidenced by their ownership of shares in the corporation.

The board of directors of a cooperative, elected by all the shareholders, determines the corporation's cash requirements, which include the costs of operation, maintenance, any contemplated renovations, appropriate cash reserves and any mortgage loan payments owed by the corporation. All of the cooperative's expenses are borne by the shareholders, who pay a pro rata portion of those costs based on the number of shares allocated to each unit in the cooperative. These obligations are commonly referred to as "maintenance payments," which ordinarily are made on a monthly basis.

Because cooperative purchasers participate in the ownership of a building as shareholders in the corporation, it has been noted that they assume more responsibility and play a larger role in the maintenance of their building and that conversion of rental apartments to cooperatives improves communities and increases property values, thus making cooperative financing an attractive investment for some institutional lenders. Nevertheless, it is apparent, even from this rudimentary description of cooperative ownership, that a cooperative corporation depends on a consistent and responsible shareholder base to meet its cash requirements.

There are at least three basic types of cooperative financing that should be distinguished for purposes of this litigation. First, a potential purchaser may obtain bank financing for the purchase of shares associated with a particular apartment in a cooperative building. In contrast to the typical home mortgage, cooperative apartment loans are secured, not by the real estate, but by the shares of the cooperative corporation that are assigned to the particular apartment which is the subject of the financing.

Second, an existing cooperative corporation itself may obtain a mortgage loan secured by the value of the entire apartment building, including the land if it is part of the corporation's property. By availing itself of additional financing, an existing cooperative can make necessary improvements to the building, refinance prior mortgages or replenish a reserve fund. Presumably, capital improvements

---

**2.** *See* CHARMS Offering Summary, Declaration of Grant Hanessian in Support of Defendant Merrill Lynch's Motion for Summary Judgment and Exhibits, dated Aug. 13, 2001 ("Hanessian Decl."), Ex. M, at 001263. The summary of cooperative ownership that follows is drawn primarily from this document. *See id.* at 001243–001264.

would tend to increase the value of the cooperative's shares, or the market price for each apartment.

Third, a prospective cooperative corporation may seek a mortgage loan pursuant to its conversion of a property, typically one that was previously a rental, into a newly-formed cooperative.[3] Whether mortgage financing is offered to existing cooperative corporations or to corporations converting a property into a new cooperative, it remains fundamentally true that the corporation's ability to repay the loan will necessarily depend on a steady stream of monthly maintenance payments from shareholders and rents from non-purchasing tenants.

Most central in the process of conversion of property to cooperative ownership, and in the cooperative's operation thereafter, is the role of the sponsor. Typically, the sponsor owns the property and, upon approval of the conversion, holds all the shares of the newly-formed corporation. The sponsor transfers title of the property to the cooperative corporation in exchange for payment of the purchase price, which may include assumption or discharge of any underlying mortgages. To finance its purchase of the building, the new corporation obtains a mortgage loan secured by the value of the converted property, including the cash flow from maintenance and rental payments by shareholders and tenants. As initial owner of all the shares of the cooperative corporation, the sponsor sells the apartments and related shares to current tenants who elect to purchase, as well as to outside buyers who acquire either vacant or occupied units. The sponsor retains ownership of and remains re-

sponsible for the maintenance and any other financial obligations associated with unsold units. Thus, ordinarily, especially during the early years following conversion, the sponsor continues to be the cooperative's largest shareholder and bears the corresponding liabilities. For this reason, it is generally in the interest of the sponsor, the cooperative and lenders for the sponsor's units to be sold as rapidly as possible. The longer the sponsor holds a large number of unsold units, especially if they are vacant or occupied by rent-regulated tenants, the deeper will be the sponsor's attendant financial commitments, outlays and risks.

It is also noteworthy that the risks in lending to an existing cooperative differ from those associated with cooperative conversion loans. First, an existing cooperative has a measurable tenant and shareholder base and quantifiable monthly maintenance payments. Second, an existing cooperative may have a history of prior sales from which a prospective lender can gauge how quickly apartments turn over, how long they remain on the market and the pricing trends of recent sales.

By contrast, a lender to a newly formed cooperative lacks these measurable indicators of risk because the corporation comes into being only upon conversion of the building.[4] From these basic principles it, therefore, readily follows that repayment of a loan pursuant to a cooperative conversion hinges fundamentally on the sponsor's prompt sales of apartments to establish a tenant and shareholder base sufficient to meet all of the new corporation's expenses, including payment of the underlying coop-

---

3. *See* Cooperative Housing, Hanessian Decl., Ex. N., at 001157. The summary of cooperative financing that follows is drawn primarily from this document. *See id.* at 001157–001159.

4. This is not to say that a lender to a newly converted cooperative has nothing from which to estimate cash flow. The lender could look to prevailing market rates for similar apartments or to the income stream of the building as a rental.

erative mortgage. As a consequence, a substantial downturn in economic conditions or change in the residential market that impedes the sponsor's ability to sell units within the time limits and bounds of its resources enhances the sponsor's financial exposure, concomitantly bearing on the risks of the cooperative, the shareholders and their lenders.

A cooperative conversion in New York City is further complicated by the State's rent regulation and eviction laws. In brief, cooperative conversion plans differ in their treatment of existing tenants who choose not to purchase the cooperative corporation's shares associated with their apartments. In an "eviction plan," non-purchasing tenants are permitted to remain as renters for a specified period of time, as long as they continue to pay their monthly rent, as determined by statutory regulation. Only after their statutory right of post-conversion occupancy has expired may non-purchasing tenants be evicted. In a "non-eviction plan," non-purchasing tenants are fully protected if they wish to remain as tenants and they continue to pay their monthly rent, as determined by applicable rent regulation.

Based on these principles, it is also reasonably simple to deduce that as regards a mortgage loan to a cooperative corporation in connection with a conversion, repayment of the underlying loan will depend on sales of apartments to shareholders upon conversion. To the extent that there are non-

purchasing tenants under either an eviction or non-eviction plan, the cooperative's ability to repay the loan will be hampered if the total monthly rent paid by all non-purchasing tenants—as determined by rent regulation—when added to the total monthly maintenance payments made by the shareholders, is less than is required to pay the building's operating expenses, taxes and the cooperative mortgage loan. These potential hindrances to cash flow are greater under a non-eviction plan because of the non-purchasing tenants' virtually unlimited right of occupancy after conversion.

Against the backdrop of these essential principles, the Court turns to the specifics of National Western's investment. Prior to 1988, Gracie Associates ("Gracie" or the "Sponsor")[5] owned the property at issue here, a rent-stabilized apartment building located at 401 East 89th Street, Manhattan (the "Property").[6] In August 1988, Gracie converted the Property into a condominium with two discrete parts: a residential unit with 198 apartments and a separate commercial unit. Subsequently, on January 25, 1989, Gracie, as Sponsor, commenced the conversion of the Property into a cooperative. The Sponsor transferred title to the residential part of the building to 401 East 89th Street Owners, Inc. (the "Cooperative"). The conversion took place pursuant to a non-eviction plan, entitling non-purchasing tenants to continue occupancy at rent-stabilized rates.

---

**5.** In documents relevant to this transaction, in Gracie's listing as sponsor it is described simply as "Gracie Associates" with an address "c/o D.B.G. Property Corp./Arrandale Management Corp./Aegis Planning, Inc." *See* CorEast Loan Participation Certificates Offering Summary, Hanessian Decl., Ex. R, at 002697. Merrill Lynch argues that on its face this description denotes a single-purpose entity, as is common practice in real estate ownership, formed for the purpose of holding the Property and, therefore, not expected to own any

other assets or liabilities requiring further disclosure. National Western counters that Gracie's brief self-description alone does not sufficiently inform about the entity's financial condition. The Court considers this issue below.

**6.** *See* National Western's Memorandum of Law in Opposition to Merrill Lynch's Motion for Summary Judgment, dated Oct. 22, 2001 ("National Western Opposition"), at 5–6, for details of the factual recitation that follows.

According to National Western, the closing of the conversion was a complex transaction involving as many as six discrete steps. The operative transaction occurred, however, when CorEast Savings Bank ("CorEast") provided a $12 million loan to the Cooperative. Merrill Lynch Mortgage Capital, Inc. ("ML Mortgage") purchased the $12 million loan from CorEast. *See National Western I,* 112 F.Supp.2d at 297.

Several weeks after the closing, on March 1, 1989, ML Mortgage sold a 25 percent sub-participation interest in the CorEast loan to its affiliate, defendant Merrill Lynch. *See id.* On the following day, Merrill Lynch assigned its rights under the sub-participation agreement to National Western in exchange for National Western's payment of $2,816,215 (the "Transaction" or the "Investment"). *See id.*

In essence, National Western had purchased a right[7] to participate in the mortgage loan to the Cooperative, in effect becoming a lender to the Cooperative in the amount of its investment. By its purchase, National Western was entitled to 25 percent of the income stream from the loan, which consisted of the monthly payments of interest and/or principal by the Cooperative. By the express terms of the Transaction, CorEast remained as the servicer of the loan and was obligated to pay up to three monthly payments on behalf of the Cooperative if the latter was unable to pay.

CorEast made the mortgage loan to the owners of the residential portion of the Property, that is, the Cooperative corporation. For purposes of the loan, however, the interests of the Cooperative and the Sponsor initially were closely interrelated. As the Offering Summary for the CorEast loan certificates explains, the shares associated with all vacant apartments and apartments occupied by non-purchasing tenants were retained by the Sponsor, clearly identified as Gracie.[8] Thus, if the Cooperative's cash flow was insufficient to meet all of its expenses, the Sponsor assumed responsibility to make up the necessary payments, including any shortfalls stemming from the tenant-occupied, rent-regulated apartments. And, as discussed above, it was apparent that the nature of the conversion and the structure of the loan were such that repayment of the CorEast loan was contingent upon the Cooperative's and the Sponsor's ability to sell, or otherwise rent, apartment units to generate sufficient monthly maintenance payments from its shareholders and tenants.

In retrospect, the conversion of the Property into the Cooperative occurred during one of the most inopportune cycles of the New York City real estate market— the years following the stock market crash

---

**7.** In various documents submitted by the parties, this participation right is also referred to as a "certificate," denoting the document evidencing National Western's participatory right, as a "security," or more generally as an "interest."

**8.** *See* CorEast Loan Participation Certificates Offering Summary, Hanessian Decl., Ex. R, at 002697. At the time of the conversion, of the 198 apartments in the residential unit of the property, 150 were occupied and 48 were vacant. Of the 61 tenants who had subscribed to purchase their apartments, four of them had actually done so, leaving the Spon-

sor financially responsible for selling 48 apartments, as well as for carrying the maintenance obligations corresponding to those shares, and for any shortfall associated with the 89 non-purchasing tenants.

National Western contends, however, that the number of vacant apartments was actually 50. (National Western Opposition, at 1). Notwithstanding the discrepancy in the Offering Summary and National Western's recitation of the facts, the Court draws all reasonable inferences in favor of the non-moving party, and henceforth assumes that there were 50 vacant apartments upon the conversion of the Property.

of 1987. *See, e.g., DeSantis v. White Rose Assocs.*, 152 Misc.2d 567, 578 N.Y.S.2d 363, 364 (N.Y.Sup.1991). The Sponsor failed to sell apartment units at projected rates and at expected prices. On February 27, 1991, the Sponsor was forced involuntarily into bankruptcy. *See National Western I*, 112 F.Supp.2d at 297. After National Western had purchased its 25 percent sub-participation interest, it was revealed that National Western was not the only lender to the Sponsor. Before the transaction, Marine Midland Bank had loaned the Sponsor $19.95 million which was only partially repaid from the proceeds of the CorEast loan.[9]

## B. *NATIONAL WESTERN'S INVESTMENT EXPERIENCE AND THE 1988 CHARMS TRANSACTION*

Throughout this litigation, National Western has attempted to balance itself precariously on the rather thin edge of conflicting arguments and representations about its investment knowledge and experience. National Western here maintains that it was a relative neophyte investor in the New York City residential cooperative market. This contention must be viewed against the reality of National Western's large corporate size and extensive real estate lending portfolio, as well as the legal concept of the "sophisticated investor."[10] In fact, the record reveals investment activity on the part of National Western that far exceeds that of an ordinary investor.

By 1989, National Western had assets valued at approximately $1.6 billion.[11] In that year alone, National Western acquired long-term investments totaling approximately $381 million.[12] As of 1989, it had financed commercial mortgage loans with an aggregate value of $105 million and owned outright real estate investments worth $10 million. Even if true that only a small percentage of these sizeable investments concerned cooperatives in New York City, that fact alone hardly qualifies National Western to rank as a neophyte. On the record before the Court, as of 1989, National Western was clearly a seasoned lender and investor in a broad range of ventures and securities, and it must have possessed a fundamental working knowledge of diverse financial markets to participate in real estate investment activity totaling $115 million and in other securities valued at $381 million.

Furthermore, the record unambiguously reflects at least one prior investment by National Western in the residential cooperative market in New York City. Sometime in 1988, Merrill Lynch approached National Western for the purpose of discussing an investment product known as the Cooperative Housing Amortizing Real Estate Mortgage Securities ("CHARMS").[13] National Western contends, and the Court acknowledges, that there were differences between CHARMS and National Western's 25 percent sub-participation interest in the Transaction. CHARMS were participation interests in a

9. *See* National Western Opposition, at 6.

10. *See id.* at 1, 27. According to National Western, "Merrill knew that [National Western's] experience with cooperatives was limited to a single investment in a pool of eight loans to cooperatives that had been converted many years earlier, and that [National Western] had no experience with loans to cooperatives as part of the conversion process." *Id.* at 1.

11. Defendant's Rule 56.1 Statement of Material Facts, dated Aug. 13, 2001 "Rule 56.1 Statement", at ¶ 2.

12. Rule 56.1 Statement, at ¶ 3; *see also* National Western Annual Statement 1989, Hanessian Decl., Ex. B, at 000366.

13. Rule 56.1 Statement, at ¶ 22.

pool of eight mortgage loans to *existing* residential cooperatives in New York City.

Nevertheless, the striking aspect of National Western's investment in CHARMS is not how it differed from the Transaction at issue here, but rather the germane information conveyed to National Western relating to the product and the relevance of that same information to the fundamentals of the Transaction. In connection with its presentation of the CHARMS investment, Merrill Lynch provided National Western with two documents: the CHARMS Offering Summary[14] and a memorandum entitled "Cooperative Housing" prepared by the law firm of Paul, Hastings, Janofsky & Walker (the "Paul Hastings Memo").[15]

The CHARMS Offering Summary contains two sections entitled "Co-op Financing and Foreclosure Proceedings" and "Cooperative Apartment Mortgage Loans." The document clearly describes the financial obligations of a residential cooperative and the importance of a consistent, reliable stream of monthly maintenance payments from shareholders and tenants. It also discusses the possibility, albeit represented as unlikely, of individual shareholder default and of reversion of a cooperative to a rental apartment following a foreclosure sale. The CHARMS Offering Summary stated that either prospect would be "highly unlikely in any but a severely depressed economic climate."[16]

The Paul Hastings Memo contains similar descriptions of the consequences of in-dividual shareholder default. More importantly, the Paul Hastings Memo contains a specific section entitled "Coop Conversion; Applicability of Rent Control/Rent Stabilization." This section sets forth the basic steps necessary for converting a residential property into a cooperative and the critical differences between a conversion with an eviction plan and one with a non-eviction plan. In addition, the Paul Hastings Memo clearly alludes to the possible financial obligations of the sponsor of a cooperative conversion in the event of shareholder default or non-purchase of individual units.[17] It is undisputed that National Western received both the CHARMS Offering Summary and the Paul Hastings Memo.[18]

After discussing the investment product with Merrill Lynch, reviewing the CHARMS Offering Summary and the Paul Hastings Memo and deliberating on the merits of the investment, National Western purchased a $4 million participation interest in the CHARMS issue on November 14, 1988.[19] National Western's investment in CHARMS occurred approximately three months before Merrill Lynch contacted it about participating in the CorEast loan.

## C. THE TRANSACTION, NATIONAL WESTERN'S INTERNAL DELIBERATIONS AND THE AGREEMENT

Shortly after National Western purchased a participation interest in the

**14.** CHARMS Offering Summary, Hanessian Decl., Ex. M.

**15.** Paul Hastings Memo, Hanessian Decl., Ex. N.

**16.** CHARMS Offering Summary, Hannesian Decl., Ex. M.

**17.** *See* Part V.B.1 *infra* for a further discussion on the significance of the CHARMS Of-fering Summary and the Paul Hastings Memo to the matter before the Court.

**18.** *See* National Western Opposition, at 4. In fact, both the CHARMS Offering Summary and the Paul Hastings Memo were produced by National Western from its files pursuant to Merrill Lynch's discovery requests.

**19.** Rule 56.1 Statement, at ¶ 24.

CHARMS product, Merrill Lynch approached National Western about the Transaction at issue here. John Cutting ("Cutting"), a Merrill Lynch Vice President in the company's New York office, initiated the solicitation relating to the Transaction. On February 7, 1989, Cutting sent National Western an Offering Summary detailing the participation interests in the CorEast loan.[20] At National Western, John Howard ("Howard"), Vice President of Finance, and Hans Weber ("Weber"), Assistant Vice President, were the only officers who communicated directly with Merrill Lynch with regard to the CorEast loan participation interests.[21]

After the initial discussions between Merrill Lynch and National Western, Howard presented the investment opportunity to a number of officials inside National Western, including Robert L. Moody ("Moody"), the Chairman and Chief Executive Officer, Charles Milos ("Milos"), Vice President in charge of the company's real estate portfolio, and Will Davis, Esq. ("Davis"), National Western's regular outside counsel. The details of these internal deliberations are central to understanding how much National Western knew about the investment at issue and the degree of sophistication exhibited by the company in connection with its participation in the Transaction. Specifically, some of these internal deliberations reveal a sophisticated understanding on the part of National Western as to the nature of the CorEast loan and a critical approach to the cash flow model used to evaluate the Transaction. They substantially negate National

Western's contention that in entering into the Transaction it relied entirely on Merrill Lynch's expertise and material representations or omissions concerning the New York residential cooperative market. Moody himself concedes that he had some concerns about the cash flow of the investment in the event that it reverted to a rental and that he directed Howard to recalculate the model consistent with his instructions.[22]

After adjusting the cash flow model for the Transaction and reviewing the Offering Summary and related documents, Howard presented the Transaction to National Western's Investment Committee at its regularly scheduled meeting on February 24, 1989.[23] After that meeting, according to Milo's testimony, National Western's Investment Committee raised additional questions, this time relating to the independent investment rating assigned to the Transaction, the state of the market for apartment units and valuations of the Property.[24] Once again, Howard was instructed to obtain more information.

Apparently, the Investment Committee approved National Western's participation in the Transaction shortly thereafter, as National Western entered into an Assignment and Assumption Agreement (the "Agreement") with Merrill Lynch on March 2, 1989.[25] The Agreement was signed by Weber for National Western and by Matthew T. Kaiser, Vice President of Merrill Lynch. Notably, section 3(d) of the Agreement contains an express warranty by the Assignee, National Western,

---

20. Rule 56.1 Statement, at ¶ 31; CorEast Loan Participation Certificates Offering Summary, Hanessian Decl., Ex. R.

21. Rule 56.1 Statement, at 35.

22. *See* Part V.B.3 *infra* for a discussion on the modifications to the cash flow model sought by Moody.

23. Rule 56.1 Statement, ¶ 48. The related documents are the subject of Part III.D *infra*.

24. Deposition of Charles Milos, dated June 28, 2000, Hanessian Decl., Ex. G., at 23–25.

25. Rule 56.1 Statement, ¶¶ 62–65; Assignment and Assumption Agreement, Hanessian Decl., Ex. DD.

that it considers itself a substantial and sophisticated institutional investor.[26]

### D. THE ADMISSIBILITY OF RELATED DISCOVERY AND TRANSACTION DOCUMENTS

It is an unfortunate and macabre reality of litigation that extends as long as this action that crucial witnesses have passed away since the dispute first arose. *See National Western I,* 112 F.Supp.2d at 296. Both Howard and Weber are deceased,[27] which leaves the parties and the Court partially without the benefit of their personal recollections. The parties' ability to authenticate documents has also been hampered by this circumstance. In particular, in connection with its motion, Merrill Lynch has submitted and relies upon three documents which go to the heart of the dispute at bar and which National Western argues are inadmissible: (1) the notes taken by two separate attorneys at separate interviews of Howard (the "Howard Notes"); (2) the independent rating assigned to the Transaction by the firm of Duff & Phelps (the "D & P Rating"); and (3) the appraisal of the Property at issue by the firm of William A. White/Tischman East, Inc. (the "Appraisal").

Because of the importance of the Howard Notes to this litigation and the circumstantial guarantee of trustworthiness in them, the Court finds that the Howard Notes are admissible under Rule 807 of the Federal Rules of Evidence. Based in part on the Howard Notes and other verifiable facts, the D & P Rating is also admissible. A genuine issue of fact remains, however, with respect to the Appraisal, and the Court continues to hold that it cannot admit more of the Appraisal than was warranted at the outset of this litigation. *See National Western I,* 112 F.Supp.2d at 301.

### 1. The Howard Notes

In August and September of 1993, after the commencement of this litigation, attorneys for both Merrill Lynch and National Western interviewed Howard. In a memorandum dated August 9, 1993, Jonathan D. Siegfried, counsel to Merrill Lynch, memorialized the substance of his interview with Howard.[28] An attorney for National Western also interviewed Howard on September 23, 1993.[29]

The notes from these two sources are largely consistent, with a few notable exceptions. In the National Western version, Howard admits to having reviewed portions of the Appraisal and the D & P Rating. His recommendation to participate in the Transaction was based on these documents, the cash flow projections he calculated and Merrill Lynch's "stature" in the business. Howard also opined that Merrill Lynch had made adequate disclosures to National Western. Finally, the National Western version of the notes reflect a basic understanding by Howard of the fundamental nature of the Transaction, that "the Sponsor had to pay its obligations."[30]

In the Merrill Lynch version, Howard evidences the same fundamental understanding of the Transaction and of the nuances in eviction versus non-eviction conversion plans. He also confirms rely-

---

**26.** Assignment and Assumption Agreement, Hanessian Decl., Ex. DD.

**27.** Merrill Lynch Memorandum, at 7–8.

**28.** Interview with Jack Howard, Hanessian Decl., Ex. Z.

**29.** Deposition of Richard A. Williamson, dated Apr. 25, 2000 ("Williamson Dep."), Hanessian Decl., Ex. Y. The typed version of the Howard interview notes are attached as Ex. D to the Williamson Dep.

**30.** *Id.*

ing on the D & P Rating and portions of the Appraisal, although the memorandum implies that Howard had the benefit of the entire Appraisal. The Merrill Lynch version also contains Howard's account of the history and reputation of the Moody family, which was less than flattering, as well as his unsubstantiated speculations as to National Western's motives in this litigation.

There is no question that the Howard Notes are the written recollections of attorneys who had interviewed Howard, and as such, they are hearsay. On this ground and others, National Western contends that the Howard Notes are inadmissible. Merrill Lynch acknowledges the hearsay issue, but asserts that the Howard Notes are admissible pursuant to Rule 807 of the Federal Rules of Evidence ("FRE"), the residual exception to the hearsay rule.

In pertinent part, Rule 807 states:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed.R.Evid. 807. *See also United States v. Bryce,* 208 F.3d 346, 350 (2d Cir.1999) (as amended Mar. 7, 2000) ("the catchall exception to the hearsay rule ... permits the admission of hearsay if (i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party.") (citations omitted).

At the outset, the criteria set forth in Rule 807 and *Bryce* weigh heavily in favor of admission of the Howard Notes. The facts to which the Howard Notes relate are not only "material," they are crucial to the dispute at hand. Howard assumed primary responsibility for assessing investment opportunities for National Western during the relevant time period. His understanding of the Transaction and the documents that he acknowledged receiving pursuant to the deal are central to this litigation. He presented the Transaction to National Western's CEO, had substantial discussions with Moody and other National Western officials—some of which Moody acknowledges occurred—and conducted relevant analysis material to National Western's decision to proceed with the investment.

There is also no question that as to Howard's recollection of the operative events, no more probative evidence exists than that which comes from Howard himself, even if through an intermediary. For these reasons, the Court cannot envision how the interests of justice would be served by precluding the Howard Notes, given his direct and crucial involvement in the Transaction. There is also no dispute that Merrill Lynch provided notice in its memorandum in support of summary judgment of its intent to seek admission of the Howard Notes and that National Western not only had ample time contest Merrill Lynch's offer of evidence, but did so vigorously in this motion and in prior submissions to the Court. Thus, the considerations set forth in Rule 807 favor admission of the Howard Notes. *See Bryce,* 208 F.3d at 351; *Copperweld Steel Co. v. Demag–Mannesmann–Bohler,* 578 F.2d 953, 964 (3d Cir.1978).[31]

---

**31.** Specifically, in *Copperweld,* the Court held

that an attorney's interview memorandum

National Western takes issue primarily with the trustworthiness of the Howard Notes and the possible bias in his statements. It points out that the notes were taken from interviews that occurred more than four years after the Transaction and after this litigation had commenced. *See United States v. AT & T*, 516 F.Supp. 1237, 1241 (D.D.C.1981) (" 'substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation.' "). In addition, National Western suggests that the bar for trustworthiness is much higher, requiring objective tests such as proof that the witness reviewed and edited hearsay notes. *See, e.g., Copperweld*, 578 F.2d at 964 n. 16. Furthermore, National Western notes that the company fired Howard in part because of the failure of the Transaction and that Howard offered a self-serving and critical account of the Moody family. From all of this National Western implies that Howard's four-year old recollections are untrustworthy, that the recently filed litigation led him to misrepresent his own failings, choosing instead to highlight National Western's, and that Howard had a retaliatory motive against the company because of his termination.

The Court is not persuaded that National Western's purely speculative musings are sufficient to overcome the underlying importance and probative value of Howard's statements, given their uniqueness. First, the fact that the parties had commenced litigation at the time the notes were taken may cut both ways. Although National Western speculates that Howard

was trying to absolve himself of liability, the fact that a federal court action had been filed would have also urged caution and truthfulness. Howard would have known that his statements might soon be tested in a court of law, where, as a central player in the Transaction, he undoubtedly would be called to testify under oath. In addition, whatever biases he may or may not have held, Howard recounted substantially identical versions of the events to the attorneys from both National Western and Merrill Lynch, about six weeks apart, after being presented with Transaction documents. As the Court's analysis in *Bryce* indicates, trustworthiness is a fact-specific inquiry not conveniently reduced to rigid rules. *See Bryce*, 208 F.3d at 351. Balancing the specific marks of trustworthiness present here with the paramount importance of Howard's recollections and the absence of an alternative source of that critical information, the Court finds that the Howard Notes are admissible for purposes of the present motion. *See AT & T*, 516 F.Supp. at 1240 ("Thus, the admission of these documents would contribute to the ultimate goal of the determination of the truth through the adversary process, and would thereby serve the interests of justice.").

## 2. *The D & P Rating*

Merrill Lynch's marketing of the CorEast loan participation interests included obtaining an independent rating by a professional rating agency. In February 1989, Duff & Phelps Credit Rating Co. ("D

was admissible over hearsay objections "(1) because it was material, 'stating the attitude of the person who was most clearly involved in the dispute'; (2) because it was trustworthy, there was no reason presented to doubt its truth and the statement was authenticated as being that of Holmquist; (3) because it was more probative than any other evidence admitted as it was direct evidence of the

thoughts of Holmquist, Copperweld's officer in charge during the negotiations and early trials with the caster; and (4) because it was reviewed by Holmquist and apparently adopted as his statement of the case, it would serve the interests of justice as well as the rules to admit the memorandum." 578 F.2d at 964.

& P") was assigned by Merrill Lynch to issue an independent rating on the Transaction. D & P concluded that the CorEast. loan participation interests were worthy of a "4" rating, corresponding to an AArating on the scale commonly used by other rating agencies.[32] An investment with a "4" rating is characterized by high credit quality, strong protection factors and modest risk that "may vary slightly from time to time because of economic conditions."[33] The D & P rating analyzed the property valuations of the Cooperative, evaluated the cash flow model and applied stress tests to those valuations. Most importantly, the D & P rating clearly states that the risk involved in the Transaction was that of the Cooperative's shareholders' defaults—which would have included the Sponsor as the largest shareholder—on the mortgage payments, possibly resulting in losses that would be borne by the holders of the participation interests.

Although it has not explicitly challenged the admissibility of the D & P Rating, National Western has attempted to raise an issue as to whether it considered the rating before making its investment in the Transaction.[34] The Court finds this implication disingenuous. First, Howard stated in both of his interviews that the D & P Rating was one of the primary documents upon which he relied when assessing the Transaction. Second, Moody himself repeatedly emphasized that National Western relied heavily on independent ratings when evaluating investment opportunities. For instance, in his deposition Moody con-

firmed that "the main thing important to me was the things I had previously testified to about the appraisal and the rating and the things that to me make a real estate go is the cash flow," and that "[w]e rely at National Western very heavily on ratings from rating agencies."[35]

◼ Merrill Lynch offered the D & P Rating for the Court's consideration pursuant to FRE Rule 803(6), the business records exception to the hearsay rule. As the Second Circuit has held, the "principal precondition to admissibility is that the record have sufficient indicia of trustworthiness to be considered reliable." *United States v. Williams*, 205 F.3d 23, 34 (2d Cir.2000) (internal quotations and citations omitted); *see also SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395, 2000 WL 968010, at *9 (S.D.N.Y. July 3, 2000) (as amended Aug. 8, 2000). Trustworthiness under Rule 803(6) is established by laying a proper foundation for the record. *Williams*, 205 F.3d at 34. Specifically, a "custodian or other qualified witness must testify that the document was kept in the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the [record]." *Id.* (internal quotations and citations omitted). Furthermore, "[t]he custodian need not have personal knowledge of the actual creation of the document." *Id.*

◼ To establish the proper foundation, Merrill Lynch submitted, pursuant to FRE Rule 902(11), the sworn affidavit of Francis Phillip, Assistant General Counsel of Fitch, Inc., which acquired D & P,[36] and

---

**32.** Declaration of Francis Phillip, sworn to Aug. 1, 2002 ("Phillip Decl."), Hanessian Decl., Ex. AA. The D & P Rating is attached as Ex. A to the Phillip Decl.

**33.** *Id.*

**34.** *See* National Western Opposition, at 11, 18 n. 5 ("Moody did not see the rating or the Appraisal before the investment was made.").

**35.** Deposition of Robert L. Moody, dated June 28, 2000 ("Moody Dep."), Hanessian Decl., Ex. F, at 25, 55.

**36.** Phillip Decl., Hanessian Decl., Ex. AA.

the deposition of Erin E. Stafford, an employee of Fitch in its commercial mortgage group.[37] Both Phillip and Stafford represented that the D & P Rating was made in or near February 1989 by a D & P employee likely to have had knowledge about the transaction at issue, that such documents were generated as part of D & P's regularly conducted activity and that the D & P Rating was kept in the company's files in the ordinary course of business.

The representations of these witnesses properly establish the foundation for the D & P Rating, and National Western's objections are unavailing. Insofar as National Western protests the inclusion of the opinion evidence, the plain text of Rule 803(6) contemplates the admission of opinions contained in business records. The cases cited by National Western are inapposite and relate to instances where the proponent of a document made no effort to introduce it as a business record, or where the evidence was insufficient to establish that the document was generated as part of regularly conducted activity. *See, e.g.,* *Velsicol Chemical Corp. v. Monsanto Co.,* 579 F.2d 1038, 1048 (7th Cir.1978); *Waddell v. Commissioner,* 841 F.2d 264, 267 (9th Cir.1988). Furthermore, adopting National Western's position here would require ignoring the Second Circuit's admonition that "Rule 803(6) favors the admission of evidence rather than its exclusion if it has any probative value at all." *Williams* 205 F.3d at 34.

For these reasons, the Court finds that Merrill Lynch laid a proper foundation for the D & P Rating through the affidavit of Phillip and the deposition of Stafford. Pursuant to Rule 902(11), the D & P Rat-

ing was properly authenticated. Given Howard's acknowledgment of receiving the D & P Rating and National Western's stated policy, confirmed by Moody, of reliance on independent ratings, the Court finds it inherently implausible that National Western would have purchased the CorEast loan participation interests without having reviewed the D & P Rating. Therefore, pursuant to Rule 803(6), the D & P Rating is admissible for the purposes of this motion, and National Western should be charged with knowledge of the contents of the rating.

### 3. *The Appraisal*

The Court first confronted the parties' dispute over the admissibility of the Appraisal in the Decision. *National Western I,* 112 F.Supp.2d at 301. That dispute remains unresolved for purposes of the present motion.

National Western contends that "Merrill offers no evidence that it sent an Appraisal to [National Western]. [National Western] denies having seen the Appraisal." [38] For its part, Merrill Lynch argues that several National Western officials, including Howard and Moody, have confirmed receiving and relying upon the Appraisal.[39] Furthermore, Merrill Lynch contends that the entire Appraisal should be admitted because in a separate complaint filed by National Western against the appraiser, National Western stated that "[i]n deciding to purchase the sub-participation interest in the CorEast loan from Merrill Lynch, plaintiff reasonably *relied on* the representations contained in both the Offering Summary and the *appraisal incorporated therein.*" [40] According to Merrill

---

37. Deposition of Erin E. Stafford, dated Oct. 5, 2001, Hanessian Decl., Ex. VV.

38. National Western Opposition, at 11 n. 11.

39. Merrill Lynch Memorandum, at 10. Merrill Lynch also contends that there is "no

dispute that the Appraisal was available to National Western." *Id.*

40. The Complaint in *National Western Life Insurance Co. v. Von Ancken,* No. 95 Civ.1987 (S.D.N.Y. Mar. 23, 1995) is attached as Hanessian Decl., Ex. NN (emphasis supplied).

Lynch, this statement in a signed pleading should be treated as an admission by National Western, one that would support the Court's consideration of the entire Appraisal.[41]

After reviewing the parties' arguments and the documents relevant to the Appraisal, the Court finds no more grounds to admit the entire Appraisal now than when the Court first confronted this issue. First, the alleged admission of National Western in its complaint against the appraiser does not necessarily conflict with National Western's contention here that it relied on "portions of" the Appraisal. *See National Western I,* 112 F.Supp.2d at 301. "Representations contained in" and "portions of" may reasonably refer only to certain parts of the Appraisal. In addition, while National Western officers speak generally about their reliance on an Appraisal, Howard speaks more clearly in terms of reviewing specific sections. Although Howard concedes that he might have received the entire Appraisal, he specifically recalls pages 28–29 and the possibility that Cutting faxed him selected portions without transmitting the entire Appraisal.

Given Howard's specific recollections of receiving only portions of the Appraisal, and drawing reasonable inferences in favor of the opponent of a summary judgment motion, the Court finds that the more prudent course of action requires admitting only the "portions of" the Appraisal that the evidence suggests National Western must have reviewed and relied upon, at minimum pages 28–29. As the Court has already noted, that section pertains to the projected value of the Property as a rental.

### E. NATIONAL WESTERN'S RECEIPT OF THE NOTICES OF THE COOPERATIVE'S DEFAULT

Little over a month after National Western purchased its sub-participation interest in the CorEast loan, the Cooperative began defaulting on its mortgage payments. On April 12, 1989, CorEast as servicer of the loan sent the Cooperative a letter (the "April 1989 Letter") stating that the latter was in default and that the lenders were entitled to exercise their right under an acceleration provision calling for payment of all amounts due under the loan.[42] The April 1989 Letter was copied to Weber at National Western.

Apparently, the default detailed in the April 1989 Letter was cured, as monthly payments resumed and no other documents generated in 1989 reflect any action on the part of either the servicer or the certificate holders to foreclose on the Cooperative. One year later, however, on March 20, 1990, CorEast sent a letter (the "March 1990 Letter") directly to Weber, referencing National Western's sub-participation interest.[43] The March 1990 Letter unambiguously notified National Western that, irrespective of past attempts to cure prior non-payment, the Cooperative had been in default since December 1, 1989. Furthermore, CorEast informed National Western that, pursuant to the mortgage servicing agreement, CorEast had made three payments on behalf of the Cooperative and that it no longer had any obligation to make up for the Cooperative's missed payments, thus giving rise to potential risk to National Western's investment. Notably, the March 1990 Letter also explicitly set forth the possibility of

---

**41.** *See* Merrill Lynch Memorandum, at 10 n. 4. (citing *United States v. McKeon,* 738 F.2d 26, 31 (2d Cir.1984) and *Hardy v. Johns–Manville Sales Corp.,* 851 F.2d 742, 745 (5th Cir.1988)).

**42.** *See* April 1989 Letter, Hanessian Decl., Ex. FF.

**43.** *See* March 1990 Letter, Hanessian Decl., Ex. GG.

foreclosure proceedings against the Cooperative.

One month later, on April 19, 1990, CorEast sent another letter (the "April 1990 Letter") to Weber.[44] In addition to the defaults detailed in the March 1990 Letter, this notification alerted National Western to another subsequent default in April 1990. This time, foreclosure against the Property was so clearly on the table that the April 1990 Letter requested National Western's agreement not to foreclose on the Property pending a possible block sale of apartments to a single buyer. Weber indicated National Western's assent to waive foreclosure by initialing at the bottom of the April 1990 Letter. It is undisputed that National Western received all three notices of default.[45]

## IV. THE APPLICABILITY OF THE STATUTE OF LIMITATIONS TO NATIONAL WESTERN'S TSA CLAIM

■ The statute of limitations applicable to a claim under the TSA is three years. See Sioux, Ltd. v. Coopers & Lybrand, 901 F.2d 51, 53 (5th Cir.), superseded by, 914 F.2d 61 (5th Cir.1990).[46] In order to determine the date on which the limitations period began to run, the Court must look to the date on which National Western had " 'either inquiry or actual notice of the alleged fraudulent acts.' " Sioux, 901 F.2d at 52–53 (citing Jensen v. Snellings, 841 F.2d 600, 607 (5th Cir. 1988)). In particular, Merrill Lynch avers that National Western had inquiry notice more than three years before instituting this action, that is, that National Western knew or " 'should have known of facts

sufficient to excite such inquiry as would have been made in the exercise of reasonable diligence.' " Id. at 53 (citing Rutherford v. Exxon Co., U.S.A., 855 F.2d 1141, 1145 (5th Cir.1988)).

■ The concept of inquiry notice has some nuances which require elaboration. As the court noted in Jensen, the "standard for whether facts sufficient to commence the limitations period would have been discovered upon reasonable inquiry is an objective one." Jensen, 841 F.2d at 608 (citing Koke v. Stifel, Nicolaus & Co., Inc., 620 F.2d 1340, 1343 (8th Cir.1980)). Inquiry notice asks whether a reasonable person would have been alerted to circumstances that would arouse suspicion or concern or incite further investigation that, if diligently pursued, may reveal elements of the fraud which is subsequently charged. Furthermore, inquiry notice imposes an affirmative duty upon a potential plaintiff to conduct a diligent inquiry when confronted with facts tending to forewarn of the circumstances that may suggest or constitute fraud. Jensen, 841 F.2d at 607 ("The requirement of diligent inquiry imposes an affirmative duty upon the potential plaintiff. Plaintiff is not permitted a 'leisurely discovery of the full details of the alleged scheme.' ") (citations omitted); see also Martinez Tapia v. The Chase Manhattan Bank, N.A., 149 F.3d 404, 409–10 (5th Cir.1998). In short, when objective "storm warnings" would alert a reasonable investor to concerns or facts suggesting the possibility of fraudulent statements or omissions, plaintiff must inquire further and conduct a diligent investigation. Jensen, 841 F.2d at 607.

---

**44.** See April 1990 Letter, Hanessian Decl., Ex. HH.

**45.** See National Western Opposition, at 11–12. See Part IV infra for a detailed discussion on the three notices of default.

**46.** The Fifth Circuit's superseding decision pertains only to the applicable statute of limitations with respect common law fraud, see Sioux, 914 F.2d at 63–64, and thus leaves unchanged the limitations period applicable to the TSA and the court's original discussion of inquiry notice.

In the Decision, the Court accepted National Western's well-pleaded allegations as true and examined the few documents properly before it in ruling on Merrill Lynch's motion for summary judgment on National Western's breach of fiduciary duty claim. Based on this review, the Court found that the defaults by the Cooperative in "late 1990 and early 1991 constituted sufficient warning to National Western, as acknowledged by Mr. Weber, to have created a duty for National Western to inquire into the circumstances surrounding the defaulted loan payments." *National Western I*, 112 F.Supp.2d at 323. In light of the additional notices of default produced in discovery in connection with the instant motion, however, the Court is compelled to revise this conclusion. The supplemental evidence now available makes clear that the storm warnings National Western possessed triggered inquiry notice much earlier than the period of late 1990 and early 1991 referred to in the Decision.

A little over one month after it purchased its sub-participation interest in the CorEast loan, National Western received the April 1989 Letter. Although not addressed directly to National Western the notice was copied to Weber. The April 1989 Letter leaves little room for misinterpretation, as CorEast informed the Cooperative that "[y]ou are in default under the Note, the Mortgage and the Loan Agreement in that, interest at the rate stated in the Note, interest at 4% over such stated rate, escrow late payment charges, and other sums due and payable have not been paid when due." [47]

CorEast also invoked its right to accelerate the full amount due on the mortgage: "Demand is hereby made for payment of the foregoing accrued and unpaid interest, escrow, and all other amounts due and payable under the Note, the Mortgage, [and] the Loan Agreement ... all of which amounts we now declare to be due and payable in full, immediately." [48] Although it declined to specify measures to be taken in the event of non-payment, CorEast referred to possible adverse consequences: "[i]f you fail to pay all of the same immediately upon receipt of this demand, we shall be constrained to exercise our rights under the Loan Documents and as may be provided by law." [49]

In the Court's view, the substance of the April 1989 Letter, and more importantly the timing of it, should have raised substantial questions in the mind of a reasonable investor. To receive the April 1989 Letter just over a month after committing more than $2.6 million to the Transaction would have been, at a minimum, unsettling. Such grounds for concern would have been doubly alarming to an investor, such as National Western here proclaims to be, who professes the neophyte's ignorance and inexperience in the relevant market and claims sole reliance on the expertise and representations of the securities dealer.

Nevertheless, National Western contends that in April 1989 there was no reason for concern: "The first notice, in April 1989, was not unusual. As Moody explains, such notices are often the result of technical errors that are resolved with a simple phone call." [50] Drawing all reasonable inferences in favor of National Western, the Court is prepared to accept the proposition that the single April 1989 notice of default, by itself, may not have sufficiently alarmed National Western to

---

47. April 1989 Letter, Hanessian Decl., Ex. FF, at 002485.

48. *Id.*

49. *Id.*

50. National Western Opposition, at 32 (citations omitted).

the degree necessary to trigger inquiry notice.

That situation changes dramatically, however, with the transmittal of the March 1990 Letter. At the outset, it is noteworthy that the March 1990 Letter is addressed not to the defaulting Cooperative, but rather directly to Weber and National Western. In addition, the scope of the Cooperative's defaults as of March 1990 far exceeds that described in the April 1989 Letter, leaving no reasonable doubt that the notice was not the product of a mere technical error, nor a matter curable with a simple phone call. CorEast informed National Western that:

> amounts due under the Mortgage Note have not been paid since December 1, 1989. As required by Section 6.3 of the Servicing Agreement, [CorEast] has from its own funds remitted to Certificate holders amounts in respect of three delinquent Monthly Payments due under the Mortgage Note. [CorEast] is not obligated to make any further remittances to Certificate holders from its own funds with respect to any other delinquent payments due or coming due under the Mortgage Note.[51]

These passages are notable for several reasons. First, in addition to the default referenced in the April 1989 Letter, the March 1990 Letter details three additional missed payments. These subsequent, sequential defaults clearly signal the Cooperative's recurring inability to meet its financial obligations.

Closer to the point of the issues here in contention, because at the time of the Transaction the Sponsor held the shares corresponding to such a large portion of unsold units, and thus carried the attendant obligations to make those payments, four instances of default by the Coopera-

tive occurring within one year may reasonably be read as a telltale sign indicating that the cause of the delinquencies may fundamentally have related to the Sponsor's financial condition, notably its inability to sell units rapidly enough and/or inadequate resources to continue carrying the obligations associated with the shares and units it still held. Moreover, whatever cushion CorEast agreed to provide as the original owner and current servicer of the mortgage had evaporated because it already had paid its obligatory three months of mortgage payments on behalf of the defaulting Cooperative. Thus, on a going-forward basis, the Cooperative, the Sponsor and the investors in the loan, including National Western, lost a good measure of security that put each at risk of financial exposure should the delinquencies continue.

The most striking aspect of the March 1990 Letter, however, is its reference to foreclosure. As of March 20, 1990, National Western was on notice that foreclosure was not only a legal possibility, but also an option on the minds of the servicer. CorEast informed Weber that "[b]y reason of the above-mentioned defaults [CorEast] is entitled to accelerate the maturity of the Mortgage Note and to commence foreclosure proceedings in respect of the property . . . subject to the Mortgage."[52]

Thus, the March 1990 Letter would have alerted any reasonable investor to conclude that the Cooperative already had failed to make as many as four timely mortgage payments within the first year of the loan and that CorEast would no longer remit its own funds in the future if the Cooperative missed additional payments. Even if these facts had escaped the attention of an unobservant investor, the Court cannot fathom how National Western could

**51.** March 1990 Letter, Hanessian Decl., Ex. GG, at 002478.

**52.** *Id.*

ignore the warning in CorEast's invocation of possible foreclosure proceedings. Taken together, the situation described in the April 1989 and March 1990 Letters reveals that the Cooperative's liquidity was so dire that CorEast felt compelled to give legal notice to National Western that foreclosure against the Property was now on the table. Whatever the state of National Western's specific knowledge of the New York City residential cooperative market's finer points, the words "default" and "foreclosure," especially when appearing together on the same legal notice, have a universally alarming ring that at minimum would awaken, or provoke some reflexive shudder, in any ordinary investor, let alone a sophisticated institutional lender holding real estate interests of the scope of National Western's portfolio.

National Western responds to these warnings by noting that, "[t]he March and April 1990 notices were supplemented by explanatory communications. [National Western] was told that the proposed sale of apartments to a hospital would permit the loan to be brought current and that foreclosure was not recommended. [National Western] saw no reason to make further inquiry so long as the loan was brought current and stayed current thereafter."[53] The Court finds these arguments unpersuasive and fails to see how a reasonable, even neophyte investor could respond to ominous notices with such lack of concern, and later complain that it was defrauded. That National Western believed that the loan somehow could be brought current soon enough by the proposed sale of apartments to the hospital is entirely beside the point. The relevant questions the default notices should have prompted in the mind of an objectively reasonable investor under the circumstances prevailing on that occasion are: why had the Cooperative's finances

reached such a grave state so soon in the first place; what role the Sponsor's condition may have played in the matter; and whether, objectively, National Western at that point faced a sufficient risk to its investment to warrant diligent inquiry as a basis for protecting its rights and preserving any potential claim that may have accrued in the event National Western did suffer some loss on account of the Transaction—even if on that particular occasion the default eventually were to be cured.

Any reasonable investor faced with four missed payments in the first year of a mortgage loan, the evaporation of cushion payments from the loan servicer and the possibility of foreclosure on the Property, would have looked twice at the $2.6 million invested just a year earlier and would have taken more vigorous steps to protect it. This response would be the reasonably expected course of action especially in the case of an interest acquired in a market of which the investor purports to be inexperienced and concerning securities it claims to have purchased relying solely or primarily on the representations and expertise of the seller.

On the basis of the April 1989 and March 1990 Letters, the Court concludes that National Western had sufficient storm warnings about the financial condition of the Sponsor to trigger inquiry notice. To the extent, however, that any doubt remains, and that National Western's lack of action or concern up to March 20, 1990 is consistent with the overall theory of the explanation it offers, there is simply no plausible interpretation of the facts that would permit National Western to disclaim notice of storm warnings signaling sufficient cause for concern and of facts underlying the potential fraud after receiving the April 1990 Letter.

---

**53.** National Western Opposition, at 32.

The April 1990 Letter, addressed by CorEast to National Western, notes that of the three possible missed payments detailed in the March 1990 Letter the Cooperative only made up the one that was due on January 1, 1990. Nevertheless, the Cooperative missed yet another mortgage and escrow payment due in April 1990, bringing the total of missed payments to at least five of the total of thirteen that were payable since the inception of the loan. The most recent April 1990 default was crucial. Because CorEast had already made three payments on the Cooperative's behalf, CorEast would not, and was not obligated to, make up that missed payment. No one else, including the Sponsor, came forward with the necessary funds in April 1990.

Furthermore, by April 1990, foreclosure was not just a mere possibility, it was essentially a foregone conclusion unless an eleventh-hour miracle saved the Transaction. The letter states:

> We've been informed by [the Sponsor] that there is a contract to sell approximately 50 of the vacant apartments to Memorial Sloan–Kettering Hospital, which *should close within approximately 45 days*. From the proceeds of that sale, we were further advised that the maintenance payments would be brought current and would allow the mortgage payment to be brought current. We therefore, recommend that no foreclosure action be started at this time, in order to allow these sales to take place and the borrower to bring the mortgage current.[54]

By this point, in this Court's view, the storm warnings were impossible to ignore.

The April 1990 Letter unequivocally informed National Western that since CorEast's last notice of default, the Cooperative had missed yet another payment. The borrowers were not simply delinquent, they were technically in default of the loan agreement. Foreclosure was the next logical step, as there was no entity to make up the deficit in missed payments or to pay future obligations. There was one last hope, but it was explicitly represented as a prospect sufficiently contingent that no reasonable investor could have used that chance to shutter himself from signposts that forewarned of the Cooperative's chronic financial straits and that in turn augured the insolvency of the Sponsor. According to the April 1990 Letter, the Memorial Sloan–Kettering deal, reported solely on possibly self-serving representations made by the Sponsor who apparently had repeatedly defaulted, "should close within approximately 45 days." But there were no assurances in the April 1990 Letter that the prospective buyer could be prevented from continuing to negotiate for better terms, from extending those negotiations or from walking away from the deal entirely.[55]

Nevertheless, the April 1990 Letter requested National Western's assent to waive foreclosure for at least 45 days to see whether the rescuing deal transpired. Weber initialed the notice, indicating National Western's agreement to waive foreclosure. That assent, however, does nothing to diminish the warnings that would have been evident to any reasonable, ordinary investor. Borrowing the metaphor in *Jensen*, if the April 1989 and March 1990

---

**54.** April 1990 Letter, Hanessian Decl., Ex. HH, at 002471 (emphasis supplied).

**55.** In fact, as of June 28, 1990, the date of the Sponsor's Sixth Amendment to the Cooperative Offering Plan, it appears that an agreement for the block sale to Memorial Sloan–

Kettering was reached, but not yet consummated. (*See* Sixth Amendment to Offering Plan, Hanessian Decl., Ex. JJ, at 8.) Notwithstanding the agreement, the Sponsor was forced into bankruptcy proceedings on February 27, 1991.

Letters constituted "storm warnings," then the April 1990 Letter signaled a thunderous, full-blown meteorological event. *See Jensen,* 841 F.2d at 607. Cumulatively, these correspondences are sufficient to sustain a fair inference that after four consecutive, and as many as five total, missed payments within the first year of the loan, the Cooperative and its Sponsor were probably insolvent and a step away from losing their investment. Foreclosure on the Property was imminent. These alarms triggered at that point National Western's duty to investigate what it alleges it was fraudulently not told, or what it did not know, about the financial condition of the Sponsor.

Despite the unmistakable warnings in the three notices of default, National Western clings to its belief that the information would not have stirred any cause for concern or suspicions in a reasonable investor. It claims that inquiry notice is not triggered unless the disclosures relate directly to the fraudulent misrepresentations or omissions at issue.[56] National Western chooses to interpret the three notices of default as mere indications of the Cooperative's financial problems, not necessarily suggestive of fraud. *See Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 878 (9th Cir.), *cert. denied,* 469 U.S. 932, 105 S.Ct. 329, 83 L.Ed.2d 265 (1984). National Western's position seems to be that in order to trigger inquiry notice of fraud, it would have had to see more particular evidence of the specific fraud it subsequently alleged than was contained in the three notices of default it had been supplied by April 1990.

National Western's response is unavailing. First, to the extent National Western contends that the disclosures in the three default notices were unrelated to the particular fraud it charges here, the record speaks for itself. National Western's

remaining claims under the TSA and for common law fraud are grounded on its allegation that Merrill Lynch, when marketing the investment prior to the Transaction, omitted to provide information about the importance and financial condition of the Sponsor. Even assuming that such information fell within the scope of disclosures Merrill Lynch had a legal duty to provide under then prevailing financial market standards and practices—a proposition that is by no means settled on the record before the Court—as the Court's analysis demonstrates above, the three default notices transmitted to National Western collectively indicated that the Cooperative and the Sponsor had repeatedly defaulted within the first year of the loan, were thus probably insolvent, and with no other entity left to repay the loan, faced imminent foreclosure.

Insofar as National Western claims that it had not been informed about the dependency of the Sponsor and the Cooperative on sales of apartments to generate cash flow necessary for mortgage payments, the April 1990 Letter could not have spotlighted the omission more glaringly nor underscored more dramatically the significance of the Sponsor's role in the process. The notice confirmed that the Sponsor was still holding 50 vacant apartments it had contracted to sell as a block; that the proceeds of that sale would be used to bring the Cooperative's mortgage payments current; and thus, that the prospect of foreclosure proceedings would ride on the Sponsor's success in that transaction. Thus, the specific disclosures in those three default notices speak directly to information bearing on the importance of the financial condition of the Sponsor to the Cooperative and the security of the Transaction—the very material that National Western claims it was not supplied and needed in order to protect its interests and

---

**56.** *See* National Western Opposition, at 33.

that forms the basis for allegations of the precise fraud it asserts.

Second, if accepted, National Western's position would come perilously close to obliterating the distinct legal concept of inquiry notice and subsuming it within the notion of actual notice. There were no more glaring disclosures pointing to facts suggesting the particular fraud National Western claims in Merrill Lynch's omitting to provide financial information about the Sponsor than those present in the three notices of default, and the law requires no more in order trigger inquiry notice. The central point of the doctrine, as its name conveys, is the availability of sufficient notice to incite further *inquiry,* and not concrete evidence of the fully-formed and revealed conduct constituting the asserted fraud. Were the latter standard to prevail, there would be no need for the concept of inquiry notice. For by the time proof of fraud is firmly grasped, what would be called for from the victim would not be cognizance of critical storm warnings, but, now armed with *actual* knowledge, his race directly to the courthouse. As the court in *Jensen* noted, "[t]he requisite knowledge, actual or constructive, needed to begin the running of the prescriptive period is *merely that of the underlying facts,* not that of the legal cause of action itself." 841 F.2d at 608 (emphasis supplied); *see also Martinez Tapia,* 149 F.3d at 410 ("[i]nquiry notice is triggered by evidence of the possibility of fraud, not by complete exposure of the alleged scam."). Here, the "underlying facts" or "possibility" of the fraud National Western charged lay precisely in the financial condition of the Sponsor that, at least as of April 1990, National Western had notice of and reason to inquire more about.

Similarly unavailing is National Western's contention that the resumption of payments by the Cooperative quelled any concerns that National Western might have had. If accepted, National Western's position would permit a potential plaintiff to close his eyes to the possibility of fraud after the occurrence of some fortuitous event that perpetuates the false sense that all is well. This, in turn, would render meaningless the duty imposed on the plaintiff to investigate *upon the revelation of the underlying facts* tending to indicate the fraud he later asserts. *See Jensen,* 841 F.2d at 607 ("the better reasoned rule is that an act of concealment should not relieve the plaintiff of his duty to exercise reasonable diligence to discover the fraud.") (citations omitted); *Martinez Tapia,* 149 F.3d 404; *see also Reed v. Prudential Securities, Inc.,* 875 F.Supp. 1285, 1289 (S.D.Tex.1995). National Western's argument also contravenes the stated objectives underpinning statutes of limitation. As the Court in *Jensen* noted, statutes of limitation promote fairness to all parties, avert "claims that have been allowed to slumber," and recognize that "the right to be free of stale claims in time comes to prevail over the right to prosecute them." *Jensen,* 841 F.2d at 607.

Finally, if National Western truly was the unsophisticated investor inexperienced in cooperative conversions that it claims to be, the Court might have been willing to entertain the notion that National Western was somehow shielded from the storm warnings. That is far from the reality presented in the summary judgment record. Rather, its own CEO confirms that National Western knew just what it was getting into and exactly what its investment had turned into by April 1990. After being presented with the April 1990 Letter at his deposition, Moody testified that "I was concerned about the security not being what we thought it was when we had it, yes. That was probably my first inklings of it, yes." [57]

___

57. Moody Dep., at 101.

Moody's remark is telling in two critical respects. First, he concedes that in fact by April 1990 National Western *was* "concerned" about its investment in the Transaction. And second, he implicitly acknowledges awareness that something must have occurred to raise doubts in his mind that National Western's security was no longer "what we thought it was." In those words, Moody reveals that National Western's thinking about its investment had changed by April 1990 from its prior view of the security. Among the leading possibilities that the underlying facts and circumstances would suggest to a reasonable person to bring about the sudden reversal is that some material information upon which the investor's first opinion rested may have been misrepresented, thus prompting cause for further inquiry. Yet despite its express acknowledgment of concern and avowed reason to believe that its investment was then not what National Western once thought it was, the company did nothing to initiate an investigation into the possible grounds for the altered circumstances, banking instead on the contingent salvage sale of the Sponsor's vacant apartments to rescue its security from foreclosure.

Later, Moody confirmed that "I don't know if [the default notices] were copied to me, but they called me and told me about them when I was there. *It's something that I'm very concerned about when something goes bad.*" [58] Clearly, the storm warnings foreboding that something had gone bad had reached National Western, and through its officers, they caught the attention of the very top of the company's governing structure. As stated earlier, National Western may profess ignorance of the New York City cooperative housing market, but no amount of disclaimers can genuinely persuade a reasonable fact-finder that National Western was not aware of the portentous meaning of "default" and "foreclosure," regardless of the financial market to which the terms applied.

The three notices of default are uncontroverted evidence irrefutably demonstrating that as of April 19, 1990 at the latest, National Western had knowledge of facts from which it discovered or should have discovered the omission of information pertaining to the importance and financial condition of the Sponsor that it claims Merrill Lynch fraudulently failed to disclose. The present action was commenced on May 14, 1993, thus not within three years of the date of inquiry notice. Accordingly, National Western's claim under the TSA is barred by the statute of limitations.

## V. NATIONAL WESTERN'S COMMON LAW FRAUD CLAIM

■ Although the Court finds that National Western had inquiry notice at the latest by April 19, 1990 of disclosures pointing to underlying facts suggesting the fraud it later alleged, National Western still filed its claim of fraud under Texas common law within the applicable four-year statute of limitations. *See Sioux*, 914 F.2d at 63 ("We agree that *Williams* requires application of a four-year limitations period to actions for [Texas] common law fraud and federal securities law fraud.").

As noted above, the crux of National Western's allegation of fraud is its belief that Merrill Lynch failed to provide, or omitted, material information relating to the financial condition of the Sponsor. Specifically, National Western contends that it would not have made an investment in the CorEast loan participation interests if it had known that (1) the Sponsor was dependent on sales and faced a "certain" cash flow deficit; (2) the CorEast loan was

---

58. *Id.* at 150 (emphasis supplied).

not sufficient to repay the Sponsor's existing debt; (3) in order to secure $14 million of its pre-existing debt, the Sponsor had pledged unsold units in the Cooperative to the third-party lender; (4) the pre-existing debt would be paid from proceeds of sales of the Sponsor's Cooperative apartments, and therefore such sales proceeds could not be used to pay maintenance until the pre-existing debt was repaid; (5) the Sponsor had managed to sell only four units when Merrill Lynch had represented that 61 had been sold; and (6) the Sponsor was already delinquent on maintenance obligations to the Cooperative in February 1989, one month before National Western's investment.[59]

■ In order to survive Merrill Lynch's motion for summary judgment on its claim of fraud under Texas law, National Western must raise a genuine issue of material fact on all the elements of fraud. Thus, National Western must show that (1) Merrill Lynch made a material misrepresentation or omission; (2) the representation or omission was false or misleading; (3) when the representation or omission was made, Merrill Lynch knew that it was false or made it recklessly without any knowledge of its truth; (4) Merrill Lynch made the representation or omission with the intent that it should be acted upon by National Western; (5) National Western acted with reasonable reliance upon the representation or omission; and (6) National Western suffered injury. *See National Western I,* 112 F.Supp.2d at 315 (citing *Eagle Properties, Ltd. v. Scharbauer,* 807 S.W.2d 714, 723 (Tex.1990)).

■ For the purposes of this motion, and drawing all reasonable inferences in

favor of the non-moving party, the Court is prepared to accept, without making any specific findings to that effect, that National Western's claims raise reasonably arguable issues of fact with respect to the first two elements. In regard to the next two elements, which pertain to Merrill Lynch's alleged knowledge of the falsity of the misrepresentations or omissions and to its intent to defraud, the Court has substantial doubts that on the record before it a rational trier of fact can reasonably find the requisite scienter and rule in favor of National Western. Nonetheless, given that questions of states of mind, such as knowledge and intent, are so inherently fact-intensive, the Court assumes for the purposes of argument that it is able to resolve doubts in favor of National Western on these points and thus refrains from further detailed analysis and reaches no specific conclusions with regard to the third and fourth elements. However, with respect to the fifth element—justifiable reliance—the Court finds that the record is devoid of any competent evidence raising a genuine issue of material fact upon which a reasonable trier of fact could rule in favor of National Western. In short, the Court concludes that National Western could not persuade a rational jury that, as a basis for its investment decision in connection with the Transaction, National Western actually and justifiably relied on Merrill Lynch's alleged misrepresentations or omissions.[60]

As the Court noted in the Decision, to sustain its burden under the reliance element, National Western must show that its reliance was both justifiable *and* actual. *National Western I,* 112 F.Supp.2d at 316 (citing *Haralson v. E.F. Hutton Group,*

**59.** National Western Opposition, at 17.

**60.** Intermittently, the parties have informally addressed the issue of damages and injury throughout this litigation, usually in the form of letter briefs. The Court finds it unneces-

sary, however, to rule on the element of injury in light of its holding that National Western did not actually and justifiably rely on Merrill Lynch's alleged misrepresentations or omissions of information concerning the Sponsor's financial condition.

**358**

*Inc.,* 919 F.2d 1014, 1025 (5th Cir.1990) (as modified Jan. 25, 1991), *overruling on other grounds recognized by Lewis v. Fresne,* 252 F.3d 352 (5th Cir.2001)). Justifiable reliance hinges on "whether—given a fraud plaintiff's *individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud*—it is extremely unlikely that there is actual reliance on the plaintiff's part." *Haralson,* 919 F.2d at 1026 (emphasis supplied).

As the passage above implies, the law recognizes that not all persons, entities and institutions rely on others to the same extent or in exactly the same way when making important decisions. In particular, courts frown upon claims of justifiable reliance made by sophisticated investors with experience, insight and access to information beyond that available to the neophyte investor. *See id.; see also Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 737 (2d Cir.1984). The courts' disinclination to entertain claims of justifiable reliance from seasoned investors is based on the simple recognition that a "sophisticated investor requires less information to call a [mis-]representation into question than would an unsophisticated investor," and that a "sophisticated investor is more likely to know[ ] enough so that the ... omission still leaves him cognizant of the risk." *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.,* 132 F.3d 1017, 1028–29 (4th Cir.1997) (internal quotations and citations omitted).

■ Whether or not an investor is sophisticated, it is axiomatic that no potential plaintiff may justifiably rely on a misrepresentation or omission that is preposterous, or so patently and obviously false that he must have closed his eyes to avoid the truth. *See General Motors Corp., Pontiac Motor Div. v. Courtesy Pontiac, Inc.,* 538 S.W.2d 3, 6 (Tex.Civ.App.1976). In addition, in a claim alleging fraudulent omissions, a plaintiff may not succeed where he has actual knowledge of the information that he claims was omitted. *See Haralson,* 919 F.2d at 1030 ("We hold that Hutton's knowledge of these facts establishes that Hutton could not have justifiably relied on any Aubin-party representation as to Mercury's value.").

In light of these informing principles, the Court finds that (1) National Western was a sophisticated investor; (2) through various disclosures in 1988 and 1989, National Western knew, or should be charged with knowledge, of the importance to residential cooperative transactions of the Sponsor's financial condition; and (3) consequently, National Western did not actually and justifiably rely on Merrill Lynch's representations or omissions regarding the Sponsor's financial information that National Western now claims was essential to its evaluation of the Transaction.

### A. *NATIONAL WESTERN WAS A SOPHISTICATED INVESTOR*

It is undisputed that National Western is an insurance company with a national presence and that investment in various securities is one of its principal activities.[61] As the Court noted earlier, National Western had $1.6 billion in assets as of 1989, and in that year alone, its investment activity totaled approximately $381 million. Its investments in real estate, either through mortgage lending or outright ownership, was valued at roughly $115 million. Investment was such an integral part of its activities that National Western had an in-house committee, appropriately named the Investment Committee, which devoted its time to analyzing the firm's current and prospective ventures. The Investment Committee was comprised of lawyers, cor-

**61.** *See* Rule 56.1 Statement, at ¶¶ 1–11.

porate officers and even experts in real estate.[62] The resources devoted to evaluating its investment activity take National Western far beyond the realm of the ordinary, even sophisticated, retail investor.

Given the depth of its experience and resources, National Western exhibits all of the classic features of a sophisticated institutional investor. In *Banca Cremi*, the court noted that the "two most important factors are an institutional investor's " 'capability to evaluate investment risk independently, and the extent to which the [investor] is exercising independent judgment.' " *Banca Cremi*, 132 F.3d at 1029 n. 15 (citing *Order Approving NASD Suitability Interpretation*, 61 Fed.Reg. 44,100, 44,112 (1996) ("NASD Interpretation")). In assessing an institutional investor's capability to evaluate investment risk, the NASD Interpretation set forth the following considerations (1) the use of one or more consultants or investment advisers; (2) the institution's general level of experience in financial markets and specific experience with the type of instruments under consideration; (3) the customer's ability to understand the economic features of the security involved; (4) the customer's ability to independently evaluate how market developments would affect the security; and (5) the complexity of the securities involved. NASD Interpretation, 61 Fed.Reg. at 44,105.

In light of these factors, there is no question that National Western was a sophisticated institutional investor at the time of the Transaction. It had in-house financial experts independently evaluating its investment options and its general level

of experience was clearly sophisticated enough to enable National Western to understand the economics of complex security interests and the impact of market developments. *See Banca Cremi*, 132 F.3d at 1029 n. 15.

Furthermore, in this litigation and in another, National Western conceded not only that the definition of a sophisticated investor delineated above is appropriate, but also that National Western itself falls within the ambit of that definition. In *Westcap Corp. v. City Colleges of Chicago (In re Westcap Enterps.)*, 230 F.3d 717, 720 (5th Cir.2000), a subsidiary of National Western specializing in government bonds and asset-backed securities was forced into bankruptcy. In bankruptcy, City Colleges sued the subsidiary for alleged misrepresentations and omissions by one of the subsidiary's brokers. National Western, as *amicus curiae*, filed a brief in that action. In it National Western disclaimed the liability of its subsidiary in part on the grounds that "City College was an institutional investor with a knowledgeable and financially sophisticated board of directors, an experienced treasurer, a large securities portfolio, a history of sophisticated investment, and a national public auditor."[63] In that same brief, National Western acknowledges that it is "a regular participant in the securities market."[64]

In this dispute, National Western specifically held itself out as a sophisticated investor when it signed the Assignment and Assumption Agreement for the CorEast loan participation interests. By signing the Agreement, National Western

---

**62.** For example, Milos was National Western's Vice President and was specifically charged with overseeing the company's real estate investments. *See* Rule 56.1 Statement, at ¶ 37.

**63.** *Amicus Curiae* Brief of National Western Life Insurance Co. In Support of Westcap

Enterprises, Inc. and The Westcap Corporation and the Reversal of the Judgments of the Bankruptcy Court and the District Court, Hanessian Decl., Ex. C, at 8.

**64.** *Id.* at 1.

represented that it considered itself "a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Certificate." [65]

Despite its extensive investment experience and its own representations as to its sophistication, National Western seeks to diminish the importance of this attribute by claiming that it had little experience in investments involving cooperative conversions. It claims that sophistication "is not a one-size-fits-all mantle" [66] and that even seasoned institutional investors may not be sophisticated with respect all investments. *See Banca Cremi,* 132 F.3d at 1029 (citing *McAnally v. Gildersleeve,* 16 F.3d 1493, 1500 (8th Cir.1994)); *see also* NASD Interpretation, 61 Fed.Reg. at 44,105 (stating that "specific experience with the type of instruments under consideration" is also a relevant factor in assessing sophistication).

While correct as a technical matter, National Western's argument is inherently suspect in the context of this litigation. After having adopted, in essence, the general definition of a sophisticated investor in the *Westcap* litigation and after having acknowledged its own expertise in the Agreement, National Western cannot whimsically alternate between competing definitions of a sophisticated investor each time it steps into federal court.

In any event, National Western's argument is beside the point. While it is true that courts will look at an investor's specific experience or lack of experience in particular areas, there is no genuine issue of material fact as to National Western's broad expertise and sophistication in investment activity. Drawing all reasonable inferences in favor of National Western, the Court finds, for purposes of this litiga-

tion, that National Western was a sophisticated institutional investor with limited experience in investments involving cooperatives. Even so, the Court's finding recognizes that National Western's level of sophistication meant that, at a minimum, National Western was capable of understanding all of the following: (1) any investment presents some form of inherent risk; (2) investing in ventures or securities with which the investor is unfamiliar is even riskier; (3) before entering into in any investment transaction, a sophisticated investor should understand the nature of the product; and (4) when it is unclear what the investment product is or the risks associated with it, the sophisticated investor should demand information sufficient to fill the gaps in its understanding.

## B. *AS A SOPHISTICATED INVESTOR, NATIONAL WESTERN KNEW, OR SHOULD HAVE KNOWN, THAT THE SPONSOR'S ABILITY TO MEET ITS OBLIGATIONS WAS SUBSTANTIALLY DEPENDENT ON SALES OF APARTMENT UNITS*

Given National Western's level of sophistication, the Court's inquiry turns to whether National Western actually and justifiably relied on the alleged omissions by Merrill Lynch relating to the importance of the financial obligations and condition of the Sponsor.

As mentioned above, in documents critical to the Transaction, the Sponsor was identified simply as "Gracie Associates," with an address "c/o D.B.G. Property Corp./Arrandale Management Corp./Aegis Planning, Inc."[67] Such description is sufficient to alert a sophisticated institutional lender considering an investment in real

---

65. Assignment and Assumption Agreement, Hanessian Decl., Ex. DD.

66. National Western Opposition, at 25.

67. *See supra* n. 5.

estate that the Sponsor was a single-purpose entity, consistent with common real estate ownership practice, not likely to hold assets beyond the Property in question. At minimum, the disclosure should suffice for a sophisticated investor who harbors any doubts about the financial substance of the entity to make further inquiry.

Moreover, the record reveals numerous documents that clearly spell out the specific role of the Sponsor in the Transaction. In the absence of deliberate ignorance, National Western knew, or should have known, the precise role of the Sponsor in the Transaction from these disclosures. Furthermore, National Western's own employees demonstrated a fundamental understanding of the Sponsor's obligations, and proceeded to approve the Transaction actually relying on material they already possessed, or that was at their disposal, that supplied the alleged undisclosed information, as well as on their own internal analysis and deliberations. As such, National Western's reliance on Merrill Lynch's alleged omissions or misrepresentations concerning this information was neither actual nor justifiable.

### 1. *The CHARMS Documents*

The documents that National Western received pursuant to the CHARMS transaction contain several key disclosures about cooperatives. At the outset, the CHARMS Offering Summary clearly and succinctly explains that the cooperative corporation is responsible for paying for capital improvements, operational costs and any monthly payments on mortgage loans by collecting maintenance payments from its tenants:

> The Board of Directors of the Corporation periodically determines the Corpo-

ration's cash requirements by estimating the costs of operation, maintenance, and improvement of the property, appropriate reserves for such *and mortgage loan payments.* Each co-op shareholder pays a pro rata portion of the Corporation's cash requirements equal to the ratio of the number of shares of stock allocated to that shareholder's apartment to the total number of shares outstanding. These maintenance payments may be considered rent.[68]

In addition, the CHARMS Offering Summary lays out three alternatives in the event of shareholder default: (1) reallocation of the defaulting shareholders' obligations to the other shareholders; (2) assumption by the defaulting shareholder's mortgage lender of the maintenance payments until resale of the unit; or (3) foreclosure on the property itself. Mention of the third alternative is a recognition of the obligations of the cooperative corporation, or, as appropriate, its sponsor, to meet the financial obligations of defaulting shareholders in order to avert foreclosure and protect its investment. The CHARMS Offering Summary states:

> Should a default lead to foreclosure proceedings against the property itself, every tenant in the building, whether or not he has defaulted in his obligations, may be served with the process, and if he is served, the foreclosure sale cancels his lease.[69]

Although this description is ostensibly related to individual shareholder default, the message is clear: it is conceivable that shareholder defaults, if severe enough, could lead to the insolvency of the cooperative itself, triggering "foreclosure proceedings against the property itself."[70] This prospect would clearly implicate the

---

68. CHARMS Offering Summary, Hanessian Decl., Ex. M, at 001263 (emphasis supplied).

69. *Id.* at 001264.

70. *Id.*

cooperative's or the sponsor's financial interests. And the implications to the cooperative, mortgage lender and any other interested investors are even more stark and severe when the sponsor still holds a significant number of units for which it is obligated to pay corresponding maintenance, and the defaulting shareholder may be the sponsor itself.

Later, in the section entitled "Cooperative Apartment Mortgage Loans," the CHARMS Offering Summary explicitly addresses loans of the type that CorEast made to the Cooperative. There, National Western was forewarned that: "Conceivably a co-op might convert to a rental apartment building following a foreclosure sale or termination of the co-op pursuant to a shareholder vote, but both scenarios are highly unlikely in any but a severely depressed economic climate."[71] First, this passage warns that, albeit "highly unlikely," there was some chance of the risk described occurring in a severely depressed cooperative market. Second, if that event were to come to pass and sales or rentals became insufficient to meet monthly maintenance payments, the cooperative itself or its sponsor would be obligated to make payments. Foreclosure on the property itself was a noted possibility if those payments were not made. And again, foreclosure and grave consequences to the investment rise to more than a mere possibility in the event the default derives from a delinquency by a sponsor owning the shares corresponding to a large number of unsold units.

If the Sponsor's importance and obligations in a cooperative loan were not clearly or sufficiently spelled out for National Western in the CHARMS Offering Summary, the Paul Hastings Memo should leave no doubt that National Western was indeed apprised of the significance and implications of this information. The Paul Hastings Memo contains similar descriptions of individual shareholder default and significantly elaborates on cooperative loans, to which it refers as "Blanket Mortgages," secured by the land and the building. It states: "Although Coop Tenants have no personal liability on the Blanket Mortgage, they are obligated by the lease to make periodic maintenance payments which must be sufficient to cover all amortization payments as well as other cash requirements of the Coop."[72] This passage, in essence, draws a convenient flowchart describing the precise nature of the CorEast loan. Any reasonable investor could have deduced the following: (1) the cooperative or sponsor could obtain a Blanket Mortgage secured by the land and the building; and (2) the cooperative's ability to pay back the loan was dependent on "Coop Tenants," who are obligated to make periodic maintenance payments sufficient to cover those mortgage payments and all of the cooperative's other cash requirements. These obligations extend as well to the sponsor who continues to own the shares corresponding to unsold units. If, however, the "Coop Tenants" do not make sufficient periodic maintenance payments, or there were simply not enough shareholders to provide maintenance payments, the cooperative itself and/or the sponsor, in proportion to its remaining shares, would be obligated to make those payments. It is inconceivable that a rational trier of fact would conclude that a sophisticated investor, supplied with all of this information, would not understand the importance of the cooperative's or the sponsor's financial obligations or their dependency on apartment sales to shareholders.

71. *Id.* at 001265.

72. Paul Hastings Memo, Hanessian Decl., Ex. N, at 001154.

Later, the Paul Hastings Memo describes precisely the consequences of a cooperative's inability to generate sufficient maintenance payments to repay the mortgage: "in the event of tenant default on a Blanket Mortgage, provided there is no contingency reserve and the non-defaulting Coop Tenants are either not willing or not able to absorb the additional expense to cure the default, the property may be sold pursuant to foreclosure." [73]

In addition, the Paul Hastings Memo explains the critical distinction between conversions pursuant to eviction plans and non-eviction plans. Initially, the memo warns that "[a]lthough cooperatives are expressly exempt from the extensive regulation of New York City's rent control and rent stabilization laws ... the applicability of these laws must be considered by prospective cooperative lenders, particularly in the context of cooperative conversions." [74] And while it recognizes that cash flow problems may be attendant in an eviction plan, the Paul Hastings Memo underscores the heightened difficulty that may arise in a non-eviction plan: "If the building is converted pursuant to a 'non-eviction' plan, non-purchasing tenants may not be evicted at all—unless they default in the payment of rent or certain other specified obligations." [75] Thus, these disclosures informed National Western of possible cash flow problems the Cooperative could encounter resulting from non-purchasing tenants and the heightened risk associated with non-eviction plans.

Taken together, the disclosures in the CHARMS Offering Summary and the Paul Hastings Memo should have alerted National Western to the fact that in a mortgage loan to a cooperative in New York City, the ability repay the loan was fundamentally dependent on payment of obligations by the Sponsor and the Cooperative's shareholders and tenants. If the Sponsor or shareholders and tenants, or enough of them, did not pay, then ipso facto there would not be sufficient cash flow for the Cooperative to meet its obligations to repay the mortgage loan. And the Cooperative's cash flow could be hampered by non-purchasing tenants, especially in a non-eviction plan—which was the case in Gracie's conversion plan. All of these basic principles applied to the residential part of the Property upon its conversion to a cooperative. National Western was aware of them prior to the Transaction, having previously invested in CHARMS. National Western's alleged failure to understand them could only have resulted from its own disregard of these clear and unambiguous disclosures.

As the Court noted, there is no dispute that National Western received these documents during Merrill Lynch's marketing of CHARMS in 1988. Although the disclosures in the CHARMS marketing materials are difficult to miss, National Western contends that they are insufficient to negate its justifiable reliance on financial information regarding the Sponsor for purposes of the CorEast loan participation interests. Specifically, it claims that, "[i]nvestors are entitled to adequate disclosure of material facts in connection with each separate investment and are not required to extract buried information .... Disclosures must not be submerged, slighted or oversubtle; they must be accurate and accessible." [76]

National Western's argument that these disclosures were submerged, oversubtle or

---

73. *Id.* at 001156.

74. *Id.* at 001157.

75. *Id.* at 001158.

76. National Western Opposition, at 24 (citing *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 201–03 (5th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988)) (internal quotations omitted).

364

inaccessible seems implausible, if not disingenuous. The information about cooperative mortgages appeared in the primary marketing document, the CHARMS Offering Summary, and an important supporting memorandum. The disclosures were provided to the same National Western officers responsible for both the CHARMS investment and the Transaction. The relevant passages were situated underneath clearly marked section headings with visibly apparent titles such as "Co-op Financing and Foreclosure Proceedings," "Cooperative Apartment Mortgage Loans," and "Coop Conversion; Applicability of Rent Control/Rent Stabilization." The legal and technical information these documents supplied was generic: it applied as much to the operation and financing of the eight cooperative buildings that comprised the CHARMS mortgage pool, as it did to the single Cooperative that was the subject of the Transaction. National Western only needed to open its eyes to be pointed to the precise passages that explained the nature of the CorEast loan. And the passages themselves are unambiguous.

It is also important to recall the timing of these disclosures. Having purchased its interest in the CHARMS offering in November 1988, the disclosures about cooperative mortgage loans were made approximately three months before the same National Western officials began their review of the CorEast loan participation interests. Furthermore, while investors should expect adequate disclosure of all material information in connection with each of their investments, it is equally true that National Western cannot claim actual and justifiable reliance on allegedly omitted or misrepresented information that it already possessed and knew, or should have known, in the first place.[77]

## 2. The D & P Rating

To the extent, however, that National Western claims that the relevant and material disclosures were not made to it when Merrill Lynch marketed the CorEast loan participation certificates, the record belies that argument as well in other respects. In a section entitled "Major Risks," the D & P Rating states: "[t]he basic risk inherent in the certificates are defaults and late payments on the mortgages. An extremely severe economic downturn will affect payments on the mortgages. Any loss, net of liquidation proceeds, may be borne by the certificate holder(s)."[78]

The D & P Rating, which formed part of the marketing materials for the CorEast loan participation certificates, merely confirms the information that National Western learned, or should have learned, from the CHARMS documents and the Paul Hastings Memo: that a major decline in the real estate market could hamper the Cooperative's ability to receive adequate maintenance payments from its shareholders, in particular from its largest share-

**77.** The Court's discussion should not be mistaken as condoning the practice of omitting disclosures for a particular investment product based on prior disclosures made to a customer. Admittedly, any seller of securities has firm disclosure obligations with respect to each marketed product, and those obligations are discussed in a long line of cases. Nevertheless, the point here is that National Western cannot meet its burden on the element of actual and justifiable reliance if in fact the record sufficiently establishes that National Western had prior knowledge concerning the same fundamental principles of cooperative mortgage loans and the significance of the Sponsor's financial condition that it claims Merrill Lynch misrepresented or withheld. It is relevant, therefore, when a sophisticated investor receives disclosures of the fundamental principles underlying a security just three months before contemplating a similar, though not identical, investment to which the selfsame principles apply.

**78.** D & P Rating, Hanessian Decl., Ex. AA.

holder, the Sponsor, which in a worst case prospect would prevent the Cooperative from meeting its obligations under the CorEast mortgage. In that event, whatever losses accrued in foreclosure would be borne by National Western, as certificate holder. Given National Western's proportionately stated reliance on independent ratings as a principal basis for its investment decisions, a disclosure therein would have been difficult to overlook.

The obligations of the Cooperative, its dependence on shareholders to supply maintenance payments, its dependence on the Sponsor's sales of apartments to secure additional shareholders, and the risk assumed by National Western were clearly outlined or sufficiently implicit in the D & P Rating.

### 3. *National's Western's Own Deliberations*

Collectively, the CHARMS marketing documents and the D & P Rating adequately informed National Western as to the precise role and importance of the Sponsor and its financial condition in the CorEast loan. Nevertheless, National Western persists in its contention that its reliance on Merrill Lynch was actual and justifiable and that it really did not understand the nature of the security. In a case based solely on documents, that argument might be plausible if National Western argued that it failed to read or comprehend the primary marketing documents. Discovery in this case, however, included deposition testimony of key National Western employees. From this record, the Court finds that National Western itself exhibited a fundamental understanding of basic information about the CorEast loan participation interests that it alleges Merrill Lynch failed to disclose, and that no rational trier of the fact could conclude

otherwise and rule in favor of National Western in this regard.

In his deposition, Moody revealed the details surrounding two important events. First, when Howard initially pitched the CorEast loan certificates to him, Moody took a close look at the transaction. Moody understood the transaction so well, in fact, that before he would support it at the next Investment Committee meeting, he asked Howard to go back and recalculate a cash flow analysis that employed an overly optimistic vacancy rate. With regard to the cash flow projection in the event that the Cooperative *reverted to a rental*, Moody stated: "I remember seeing some page in there that they only used a vacancy factor of four percent. And I don't know if it was this page or not but I told [Howard] I thought that was insufficient and that he ought to at least triple it as far as vacancies are concerned . . . . Twelve is a more normal percentage to have." [79]

Moody's request to Howard evidences a sophisticated and insightful grasp of the very principles that National Western claims that it did not understand and that Merrill Lynch allegedly omitted to provide. First, the fact that Moody was even discussing a *rental* prospect indicates that he fully recognized and understood the *possibility* that the Cooperative would not be able to meet its mortgage payments, that it would default on the mortgage and that the Cooperative would then revert to a rental. Moody's conclusion was that a more conservative vacancy rate, in the event of foreclosure, was necessary to estimate the cash flow of the Cooperative as rental. In this light, Moody's understanding of the Transaction is entirely consistent with Howard's acknowledgment of National Western's understanding that "the Sponsor had to pay its obligations." [80]

---

79. Moody Dep., at 21–22.

80. Howard Notes, Hanessian Decl., Ex. Y, at 2.

Thus, National Western appears to be claiming actual and justifiable reliance on Merrill Lynch to provide it with basic information that it decidedly possessed and firmly grasped.

The crux of National Western's claim of common law fraud—that National Western was misled into the Transaction by the alleged omission of crucial information about the importance of the Sponsor and its financial obligations—appears not have been unavailable to National Western or misunderstood at all. The evidence on this record sufficiently establishes that rather than actually and justifiably relying on Merrill Lynch's alleged omissions or misrepresentations concerning the financial condition of the Sponsor as a basis for its Transaction investment decision, National Western actually relied on relevant information it had previously obtained with regard to that matter, as well as on the D & P investment rating, and National Western's own thorough internal analysis and deliberations concerning the Transaction.

The balance of National Western's specific allegations of fraud relate to the alleged failure by Merrill Lynch to provide information about the pre-existing loan that the Cooperative had obtained from Marine Midland Bank and the number of apartments actually sold by the time of the closing. But again, Moody demonstrates full knowledge of the existence of prior encumbrances that significantly affected National Western's security interest. Moody testified that "I asked [Howard] to go back and do some more work as to cash flow statements. I asked him to make sure that there was enough money that they were borrowing to pay off the mortgage and they had it on hand to complete the repairs."[81] In essence, Moody was instructing Howard to confirm that the Cooperative was borrowing enough from CorEast "to pay off the mortgage"—that is, a pre-existing debt—and to pay for necessary repairs and renovation.

Furthermore, National Western concedes that "Howard informed Moody that the purpose of the financing was to repay *existing debt*, to complete renovations and to provide a reserve for debt service."[82] Given National Western's admitted awareness of prior encumbrances on the Property, the Court fails to see any viable claim against Merrill Lynch for failure to provide information about the Sponsor's obligation to Marine Midland. The information was in National Western's own hands. Armed with that knowledge and all of the disclosures described above, National Western proceeded with open eyes to approve its participation in the Transaction and cannot now complain of alleged omissions pertaining to the financial condition of the Sponsor that would have deterred it from making the investment. Thus, with a firm grasp of the importance of the Sponsor and its financial condition and the Sponsor's prior debt, National Western could not have actually and justifiably relied on Merrill Lynch's alleged misrepresentations or failure to provide the very same information about the Sponsor's role and financial condition of which it now complains.

The CHARMS marketing materials and the D & P Rating are, by themselves, sufficient to establish National Western's knowledge as to the importance of the financial obligations of the Sponsor. National Western's deliberations and the testimony of its officers support this knowledge. Finally, Moody's own statements

81. Moody Dep., at 116–17.

82. National Western Opposition, at 9 (emphasis supplied); *see also* Affidavits in Opposition to Merrill Lynch's Motion for Summary Judgment and National Western's Statement of Material Facts in Dispute, Affidavit of Robert L. Moody, sworn to Oct. 15, 2001, at ¶ 28.

reflect a clear understanding of the prior debt obligations of the Sponsor. For these reasons, National Western cannot establish that it actually and justifiably relied on Merrill Lynch's alleged failures to make the operative disclosures about the Sponsor's financial condition. The Court concludes that, given National Western's individual characteristics, abilities and appreciation of facts and circumstances at or before the time of the alleged fraud, "it is extremely unlikely that there is actual reliance on [National Western's] part." *Haralson*, 919 F.2d at 1026. Moreover, insofar as National Western asserts justifiable reliance on Merrill Lynch's alleged omissions, as a sophisticated institutional investor National Western was, at the time of or before the Transaction, "likely to know[ ] enough so that the ... omission still leaves [National Western] cognizant of the risk." *Banca Cremi*, 132 F.3d at 1028–29. Accordingly, because National Western cannot satisfy one of the required elements to make out a case of fraud under Texas common law, Merrill Lynch is entitled to summary judgment with respect to this claim.

## VI. *CONCLUSION AND ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that Merrill Lynch's motion for summary judgment is GRANTED and National Western's claims under the Texas Securities Act and for common law fraud are dismissed; and it is finally

**ORDERED** that the Clerk of Court is directed to close this case.

**SO ORDERED.**