NATIONAL WESTERN LIFE
INSURANCE CO., Plaintiff–
Appellant,

v.

MERRILL LYNCH, PIERCE,
FENNER & SMITH, INC.,
Defendant–Appellee.

Docket No. 02–9004.

United States Court of Appeals,
Second Circuit.

Jan. 12, 2004.

Benjamin Zelermyer—Serchuk & Zelermyer, LLP, White Plains, NY, for Appellant.

Grant Hanessian, Baker & McKenzie, New York, NY, for Appellee.

PRESENT: LEVAL, SACK, Circuit Judges, and Hon. KORMAN,* District Judge.

## SUMMARY ORDER

### I. Choice of Law

Because this is a diversity case, the forum state's choice of law rules govern. *Krauss v. Manhattan Life Ins. Co.*, 643 F.2d 98, 100 (2d Cir.1981). Under New York conflict of law principles, fraud claims are governed by the state in which the injury is deemed to have occurred, which is usually where the plaintiff is located, *Sack v. Low*, 478 F.2d 360, 366 (2d Cir.1973) (Friendly, *J.*), in this case, Texas.

### II. Valuation of the Cooperative (Claims Dismissed under Rule 12(b)(6))

The district court granted Merrill Lynch's Rule 12(b)(6) motion to dismiss National Western's claims of violations of the Texas Securities Act ("TSA") and common-law fraud based on Merrill Lynch's alleged misvaluation of the cooperative property in issue (the "Property"). *Nat'l Western Life Ins. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 112 F.Supp.2d 292, 314 (2000) ("*NW I*"). Our review is *de novo*. *See, e.g., Scutti Enterprises LLC v. Park Place Entertainment Corp.*, 322 F.3d 211, 214 (2d Cir.2003).

---

* Chief Judge of the United States District Court for the Eastern District of New York, sitting   by designation.

## A. Valuation of the Property Under the Texas Securities Act

The district court dismissed National Western's claim that the property valuation was misleading under the TSA for three reasons: (1) "the number of irreconcilable internal conflicts" in National Western's theory, *NW I,* 112 F.Supp.2d at 308; (2) the information about the valuations given by Merrill Lynch to National Western was not false and misleading "in the particular manner claimed", *id.* at 309; and (3) the claim was time-barred under the statute of limitations, *id.* at 321.

Article 581–33(A)(2) of the TSA provides that "[a] person who offers or sells a security ... by means of an untrue statement of a material fact or an omission to state a material fact ... is liable to the person buying the security from him." The TSA continues, however, that "a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth of omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." Under the TSA, there is no requirement that the plaintiff have relied justifiably on the representation or omission; the falsity or omission need only have been uttered or made. *See Haralson v. EF Hutton Group,* 919 F.2d 1014 (5th Cir.1990), *abrogated on other grounds, Lewis v. Fresne,* 252 F.3d 352, 358 (5th Cir.2001).

### 1. Inconsistent Pleadings

The district court concluded that National Western's allegations relating to Merrill Lynch's misleading valuation of the property were fatally "internally at odds." *NW I,* 112 F.Supp.2d at 307. The contradiction, according to the court, is that National Western claims to have relied to its detriment on a misleading appraisal of the Property (the "Appraisal") prepared for Merrill Lynch while simultaneously claiming that the Appraisal was omitted from the materials given to it by Merrill Lynch, and that the omission was misleading. *Id.* Based on this inconsistency, the district court granted Merrill Lynch's Rule 12(b)(6) motion on this TSA claim.

■ But Rule 8(e)(2) specifically permits inconsistent pleadings such as those contained in National Western's complaint. *See also* 3 *Moore's Federal Practice* § 8.09[2]. It is permissible for National Western to make conflicting assertions—it didn't receive the Appraisal, but if it did, the Appraisal was misleading. *See Adler v. Pataki,* 185 F.3d 35 (2d Cir.1999); *Henry v. Daytop Village, Inc.,* 42 F.3d 89 (2d Cir.1994); *Michael v. Clark Equipment Co.,* 380 F.2d 351 (2d Cir.1967). We do not think that the attachment of parts of the Appraisal to National Western's complaint makes its claims self-contradictory because we see nothing in the Appraisal sections attached to the complaint that contradicts National Western's assertion in the alternative that it had not seen the Appraisal at the relevant time.

### 2. Information about the Valuations Not False and Misleading "in the Particular Manner Claimed" ("Future Sellout Value")

The district court concluded that "National Western has not shown that the information about the valuations it has challenged was in fact false and misleading in the particular manner claimed." *NW I,* 112 F.Supp.2d at 309. We think that the complaint pleaded falsity adequately.

According to National Western, Merrill Lynch's Offering Summary and the Appraisal "presented a false and misleading appraisal of the fair market value of the residential condominium unit based on the estimated proceeds from the sale of shares in the Cooperative." Second Amended

Complaint. In the Offering Summary, the appraised value is stated thus:

Appraised Value: The Future Sellout Value of the Residential Unit inclusive of the Mortgage Loan amount is equal to $41,135,000 in an appraisal performed by Wm. A. White/Tishman East, Inc. on January 24, 1989 (copy available on request).

JA 479.

■ According to National Western's Second Amended Complaint and the testimony of the appraiser who prepared the Appraisal for Merrill Lynch, the $41 million value of the property approximates the value of the property only under the most favorable assumptions. As the appraiser explained, "the rules of the Federal Home Loan Bank Board in providing these types of appraisals require[ ] the appraiser to value the property under three scenarios, and what's presented here is just one of those three scenarios[.] [What] should be presented as the appraised value is all three." JA 1371. In the appraiser's opinion, using only this valuation of the Property in the Offering Summary was "misleading." JA 1372. "[T]he value of the property is not $41,135,000. That value is something that might happen in the future ... [not] the current value of the property." JA 1372. National Western has pled, at least in the alternative, that it relied solely on the information in the Offering Summary and therefore did not know about the contents of the Appraisal. It is therefore not chargeable as a matter of law, on a motion to dismiss, with knowledge of the alternate, lower valuations.

3. Rental Value

The $20 million rental value in the Appraisal was based on an assumption that all units would be rented, and that their rent would be at fair market value—none would be below market as a result of New York rent-stabilization laws. This valuation was made in the late 1980s, prior to a 1995 New York Court of Appeals decision that rendered that assumption incorrect. Federal Home Loan Mortgage Corp. v. New York State Div. of Housing, 87 N.Y.2d 325, 662 N.E.2d 773, 639 N.Y.S.2d 293 (1995). As a result of that decision, even if the Property were fully rented, its rental value would be significantly less than $20 million.

■ Although, as the district court observed, "statements of the law are not actionable as false representations of fact because both parties are deemed to have equal access to and knowledge of the law," NW I, 112 F.Supp.2d at 311, this rule applies only to statements to a Texas plaintiff under Texas and federal law. Askew v. Smith, 246 S.W.2d 920, 922 (Tex.Ct. App.1952). In this case, however, the statements complained of were about New York law.

The district court also concluded that the Appraisal assumption in question was at best an "assumption," and, as such, could by definition not have been false. NW I, 112 F.Supp.2d at 312. But a "prediction" intertwined with facts can be a statement of facts that is the subject of a fraud claim under Texas law. See Trenholm v. Ratcliff, 646 S.W.2d 927, 931 (Tex. 1983). Moreover, National Western's contention appears to be, not that Merrill Lynch was wrong in its prediction of what New York law would be, but that the Appraisal failed to disclose that its rental-value valuation was based on an uncertain assumption regarding the state of the law, and was therefore misleading or, at least, contained a material omission. National Western properly pleaded that it was misled by this omission, that Merrill Lynch knew the omission was material, and that the omission misled National Western into relying on a number that turned out to be

false. Whether it can prove those elements of the claim is, of course, another matter.

### 4. Statute of Limitations for Claims Under the TSA

Under the TSA, the limitations period in which to bring suit is three years following "discovery" or five years after initial purchase, whichever occurs first. Tex.Rev. Civ. Stat. Ann. art. 581–33 H(2)(a) and (b). The underlying action here indisputably was brought within five years after National Western's purchase of its interest in the Gracie loan. "Discovery" is the date on which the fraud was known or should have been known by the plaintiff. *See id.; see also Topalian v. Ehrman,* 954 F.2d 1125, 1133 (5th Cir.1992). In order to determine the date on which the limitations period began to run, then, the court must look to the date on which the plaintiff either knew or should have known of the alleged fraudulent acts.

Merrill Lynch does not deny National Western's assertion that it did not have actual notice of the alleged misrepresentations about the value of the Property. The standard for "should have known"—"inquiry notice"—is "an objective one." *Jensen v. Snellings,* 841 F.2d 600, 608 (5th Cir. 1988). The circumstances must be such that an ordinary investor would be led to investigate the matter further. *Reed v. Prudential Sec., Inc.,* 875 F.Supp. 1285, 1289 (S.D.Tex.1995), *aff'd,* 87 F.3d 1311 (5th Cir.1996) (table). Under applicable Texas law, this duty of inquiry "extends only to those matters that are fairly suggested by facts that are actually known, rather than circumstances that merely arouse suspicion in the mind of a reasonably prudent person." *Roberts v. United New Mexico Bank at Roswell,* 14 F.3d 1076 (5th Cir.1994) (citing *Holmes v. P.K.*

*Pipe & Tubing, Inc.,* 856 S.W.2d 530, 543 (Tex.Ct.App.1993)).

The district court concluded that the "numerous inconsistencies in the pleadings and flaws evident in this aspect of National Western's fraud theory may be held sufficient to give rise to inquiry notice as of March 1989." *NW I,* 112 F.Supp.2d at 320. But "taking as true all allegations in the complaint, and drawing all reasonable inferences therefrom in the [plaintiff's] favor," *Koppel v. 4987 Corp.,* 167 F.3d 125, 130 (2d Cir.1999), National Western did not have inquiry notice more than three years before it filed its complaint. The inconsistencies—National Western's alleged receipt of only some parts of the Appraisal, the omission of the Appraisal's "rental value" (which National Western asserts, in the alternative, it did not see) from the Offering Summary, the difference between the Appraisal's "rental value" (which National Western asserts, in the alternative, it did not see) and the "future sellout value" in the Offering Summary— are simply insufficient to establish as a matter of law that National Western had inquiry notice—that it should have known of the fraud—in March 1989.

### B. Misleading Valuation Under Common Law Fraud Theory

The district court also dismissed the claim that Merrill Lynch's alleged misleading valuations were actionable as common-law fraud—a claim that differs from the TSA claim principally in that the facts pled must support a conclusion of justifiable reliance on the allegedly false and fraudulent statements. *See, e.g., R.E. Haase, PRH Investments, Inc. v. Glazner,* 62 S.W.3d 795, 798 (Tex.2001); *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex.2001). The court did so, as it did for the TSA claims, because of what it saw as irreconcilable con-

flicts in National Western's theory and because the information about the valuations was not false and misleading. *NW I*, 112 F.Supp.2d at 315. As we have already concluded, we see no such irreconcilable conflict and cannot conclude as a matter of law that the information was not false.

The district court also concluded that National Western, on the facts alleged in the complaint, cannot prove justifiable reliance, required for recovery on the common-law fraud theory. *NW I*, 112 F.Supp.2d at 317. The district court decided that the lack of justifiable reliance "independently foreclos[ed] recovery." *Id.* at 316.

Merrill Lynch argues that reliance by National Western on the alleged misrepresentations was not justified as a matter of law because National Western was a sophisticated investor with a heightened duty to investigate. *Id.* National Western claims to the contrary that it "actually and justifiably" relied on the representations concerning the market value of the Property and it was misled to believe that only the information in the Offering Summary was relevant.

"Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases. . . . [I]t is only when [the recipient of fraudulent information] knows of the falsity or it is obvious to him that his reliance is not justified." RESTATEMENT (SECOND) OF TORTS § 545A, comment b (1977).

When a defendant claims, as Merrill Lynch does here, that the plaintiff was sophisticated and therefore less likely to have justifiably relied on a representation, *NW I*, 112 F.Supp.2d at 316–17, the "justifiable" determination nonetheless remains fact sensitive. The existence of any exper-

tise or sophistication is a circumstance considered by the factfinder when it decides the issue. *See, e.g., Roberts,* 14 F.3d at 1080; *see also Lutheran Brotherhood v. Kidder Peabody & Co.,* 829 S.W.2d 300, 308 (Tex.Ct.App.), *judgment set aside and cause remanded for rendition of agreed judgment,* 840 S.W.2d 384 (1992).

The district court concluded that it is "extremely unlikely" that a prospective purchaser would make a decision based on the limited information that National Western asserted that it received. *NW I*, 112 F.Supp.2d at 317. The court has "substantial doubts as to whether the reliance [National Western] claims on the documents provided and omitted by Merrill could have been actual or justifiable." *Id.* But extreme unlikelihood and substantial doubts are not equivalent to absence of justifiable reliance as a matter of law based on the facts as pled by National Western.

■ While it is true, moreover, that a person may not justifiably rely on a representation if "there are 'red flags' indicating such reliance is unwarranted," *In re Mercer,* 246 F.3d 391, 418 (5th Cir.2001), there is nothing in the complaint that indicates the existence of "red flags" sufficient to establish as a matter of law the absence of justifiable reliance. There is thus insufficient reason for the district court to have concluded as a matter of law that National Western did not justifiably rely on Merrill Lynch's alleged misrepresentations. The question was one for the trier of fact.

The district court also dismissed National Western's common-law fraud claim as to valuation on the grounds that it was time-barred. The statute of limitations for fraud is four years, *Sioux, Ltd. Sec. Litig. v. Coopers & Lybrand,* 914 F.2d 61, 63 (5th Cir.1990), rather than three under the TSA. We disagree for the same reason

that we disagree with the court's dismissal of the TSA claim on the basis of the three-year limitations period applicable to it—as discussed above.

### III. Claims Based on Gracie's Financial Condition (Claims Dismissed by Summary Judgment)

National Western alleges that the transaction documents it received from Merrill Lynch underplayed the importance of Gracie's financial condition and misrepresented Gracie's financial health by (1) omitting "the Sponsor's dependency on sales and the high risk of default"; (2) omitting information about Gracie's pre-existing debt to Marine Midland; and (3) misstating the number of apartments that had been sold. The district court disposed of the TSA claim by concluding that it was barred by the applicable statute of limitations. *National Western Life Insurance Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 213 F.Supp.2d 331, 356–57 (2002) (*NW II* ). With respect to the common-law fraud claim, the court concluded that National Western failed to raise a genuine issue of material fact as to whether National Western acted with justifiable reliance upon the misrepresentation or omission. *Id.* at 357. We disagree on both counts.

### A. Statute of Limitations

There are questions of material fact as to when the statute of limitations began to run based on whether default by Gracie in its payments triggered inquiry notice.

Under the TSA, as noted, the limitations period in which to bring suit is three years following discovery of fraud or five years after initial purchase, whichever occurs first. Tex.Rev.Civ. Stat. Ann. art. 581–33 H(2)(a) and (b). The requirements for triggering inquiry notice, thus starting the clock on the statute of limitations, are described above. "Texas courts are in agree-ment that failure to inspect or to investigate will not defeat an action in fraud. The defrauded party is entitled to rely on the fraudulent party's representations." *Kerrville HRH, Inc. v. City of Kerrville,* 803 S.W.2d 377, 385 (Tex.Ct.App.1990). Furthermore, "[t]he duty of inquiry extends only to those matters that are fairly suggested by facts that are actually known, rather than circumstances that merely arouse suspicion in the mind of a reasonably prudent person." *Holmes v. P.K. Pipe & Tubing, Inc.,* 856 S.W.2d 530, 542 (Tex.Ct.App.1993).

The district court concluded that the "storm warnings" of Gracie's default in early 1989 (letter indicating the default in April 1989), March 1990 (letter describing again Gracie's default and discussing CorEast's entitlement to foreclose) and April 1990 (letter detailing additional missed payments) "should have raised substantial questions in the mind of a reasonable investor." *NW II,* 213 F.Supp.2d at 350. On the basis of the first two letters, the district court concluded that "National Western had sufficient storm warnings about the financial condition of the Sponsor to trigger inquiry notice;" *id.* at 352; with the third, the court concluded, "the storm warnings were impossible to ignore." *Id.* at 353. Inasmuch as the existence and receipt of the letters is undisputed, the question is whether the letters are sufficient to trigger inquiry notice as a matter of law.

We conclude in the negative. There is a triable issue of fact as to whether the events of 1989 reflected in the letters would alert National Western, acting reasonably, to the alleged fact that the investment had been sold to National Western fraudulently, as required to put National Western on inquiry notice. At that time, the real estate and cooperative market in New York City was in crisis. It

may be that as National Western asserts, it thought that the real estate crisis, rather than Gracie's undisclosed financial vulnerability, was responsible for the defaults. And, while National Western did receive a letter indicating default in April 1989, it received payment throughout that year. While National Western did receive the March 20, 1990, default letter less than a month later, National Western received another letter recommending against foreclosure and indicating that Gracie was negotiating to sell fifty vacant units to Memorial Sloan–Kettering. By July 1990, payments resumed on a timely basis and continued through the end of 1990. We do not agree with the district court's conclusion that as a matter of law the circumstances satisfied the requirements of inquiry notice.

## B. Common–Law Fraud

██ The district court premised its decision to grant summary judgment to Merrill Lynch on the common-law fraud claim on its view that National Western did not act with justifiable reliance on the misrepresentation or omission of financial information about the sponsor. *NW II*, 213 F.Supp.2d at 357. The district court concluded that "the record is devoid of any competent evidence raising a genuine issue of material fact upon which a reasonable trier of fact could rule in favor of National Western," *id.*, because National Western was a sophisticated investor and therefore knew or should have known that Gracie's ability to meet its financial obligations was important to the success of the venture. *Id.* at 358. National Western therefore cannot claim to have actually or justifiably relied on Merrill's omission of Gracie's financial condition from the offering documents. *Id.* at 366. Again, we disagree.

### 1. Evidence of Fraud

The district court did not discuss National Western's argument that the Offer-

ing Summary contained misleading information about the number of apartments sold. The Offering Summary states that "[a]s of January 26, 1989, at least 61 units (31%) *have been sold* pursuant to subscription agreements." (Emphasis added.) National Western's evidence showed that, of the 61 apartments asserted to have been sold pursuant to the subscription agreements, in fact only four had been sold; the remainder were merely under contracts of sale, many of which failed to close. As a result, the Sponsor failed to realize a substantial portion of the revenues presented in the Appraisal as resulting from the sales of the 61 apartments. We see no reason why a judgment of fraud could not lawfully be predicated on this alleged misrepresentation.

### 2. Sophistication

The district court found it indisputable, as a matter of fact, that National Western was a "sophisticated" investor. *Id.* at 360. That may be so, but it does not follow that summary judgment was appropriately granted. The district court premised its conclusion on National Western's assets, its investment activity and its in-house investment committee. *Id.* at 358–59. It also looks to the representation National Western made when signing the agreement that it was a "sophisticated institutional investor ... capable of evaluating the merits and risks of investment in this Certificate." *Id.* at 360. National Western argues that it had no experience in co-op conversions and that, in any event, sophistication is a fact question for the jury.

National Western is right on this score. That National Western was "sophisticated" in the abstract is not conclusive. "Sophisticated" entities can justifiably rely on fraudulent statements. There is a genuine

issue of material fact as to whether National Western did so.

### 3. Actual and Justifiable Reliance

The determination of whether, given National Western's experience, National Western actually and justifiably relied on the alleged fraud of omission of Gracie's financial condition requires a determination of fact inappropriate as a matter of law on the current record. Whether a plaintiff's reliance on a defendant's statements was justified depends on the facts of the particular case. "To determine justifiability, courts inquire whether—given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud—it is extremely unlikely that there is actual reliance on the plaintiff's part." *Haralson*, 919 F.2d at 1026. The district court determined that National Western neither actually nor justifiably relied on the omission based on three factors: (1) that they had the relevant information about the importance of the sponsor to the success of the venture from the CHARMS transaction and therefore should have known of the importance of Gracie's financial status, *NW II*, 213 F.Supp.2d at 361–64; (2) that they had the relevant information about the importance of the sponsor to the success of the venture from the Duff and Phelps Rating Co. ("D & P") rating, *id.* at 364–65; and (3) that their internal deliberation shows that they actually knew about the importance of the sponsor to the success of the venture, *id.* at 365–67.

#### a. CHARMS

Although the memorandum of law and related documents that Merrill Lynch provided National Western in connection with the CHARMS transaction "clearly spell out the specific role of the Sponsor in the Transaction," *NW II*, 213 F.Supp.2d at 361, they do not discuss the sponsor's role and burden. There is insufficient basis for the district court's conclusion as a matter of law that, based on the CHARMS documents, National Western knew or should have known of the role of Gracie and the importance of its financial condition.

#### b. D & P Rating/Report

There appears to be no doubt that National Western saw the D & P *Rating*, but inasmuch as the rating is simply a number from one to five reflecting D & P's evaluation of the soundness of the overall project, that National Western may have seen it appears to be immaterial.

There is a triable question of fact, meanwhile, as to whether National Western saw the D & P *Report*. But even if it did, the D & P Report does not discuss Gracie's financial obligations. That the D & P Report does not ever mention the Sponsor raises doubts about the district court's assertion that the Cooperative's "dependence on the Sponsor's sales of apartments to secure additional shareholders … [was] clearly outlined or sufficiently implicit in the D & P Rating," ** *NW II*, 213 F.Supp.2d at 365, or that the D & P Rating * "confirms" that "a major decline in the real estate market could hamper the Cooperative's ability to receive adequate maintenance payments from its shareholders, in particular its largest shareholder, [Gracie]." But neither the D & P Report nor the Rating discuss Gracie. It thus would not necessarily follow from a factual finding that National Western saw or should have seen the Report that it did not justifiably rely on Merrill Lynch's alleged misrepresentations and omissions about the sponsor, its significance and role.

---

** The district court was apparently referring to    the D & P Report.

### c. Internal Deliberations

The district court's discussion of the record of National Western's internal deliberations at the time it purchased an interest in the Gracie loan focuses primarily on the deposition of National Western's CEO, Robert Moody, but also touches on evidence with a hearsay problem: statements made by Jack Howard, National Western's chief investment officer, to lawyers in this case. Prior to his death, Howard was interviewed by lawyers for both National Western and Merrill Lynch. Both lawyers took notes. Howard told both lawyers that he relied on the $20 million rental value on pages 28–29 of the Appraisal. Although the district court agreed with National Western that the notes are hearsay, the court nonetheless ruled them admissible under the residual hearsay exception, Fed.R.Evid. 807. *NW II*, 213 F.Supp.2d at 343–45. The district court also cited the description of Rule 807 in *United States v. Bryce*, 208 F.3d 346, 350 (2d Cir.1999). We need not rule on the admissibility of this hearsay.\*\*\* Even if the Moody and Howard evidence is admissible, however, National Western is not foreclosed from establishing as a matter of fact that (i) notwithstanding Howard's statements, National Western in fact did not receive the Appraisal with its $20,000,000 rental value; or (iii) the rental value number was in any event misleading.

Whether National Western relied on Merrill's representations and omissions regarding Gracie ultimately involves questions of fact: How much did National Western actually understand? What documents did National Western have? Did National Western, in light of its experience, actually believe either that Gracie had other assets which it could employ to service the loan or that it could make maintenance payments even if it were unable to sell the apartments? Although it seems to us as it must seem to the district court that it is unlikely that National Western invested nearly $3 million without doing the kind of investigation Merrill Lynch alleges that it did, it is an unresolved question of fact.

### IV. Motion to Amend the Complaint

The district court did not abuse its discretion when it denied National Western leave to amend its complaint. *See Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir.2002); *Nettis v. Levitt*, 241 F.3d 186, 192 (2d Cir.2001).

### V. Conclusion

We share what we understand to be the view of the district court that this litigation has been overlong and is bloated out of all proportion to what is at stake. We nonetheless find ourselves compelled to return the action to the district court for further proceedings.

For the foregoing reasons, the judgments of the District Court are hereby VACATED, and the case is REMANDED for further proceedings consistent with this order.

---

\*\*\* Our mention of this evidence should not be taken for approval of its admissibility. While we do not rule on that question, we observe that fact-finding based on this evidence might well have benefitted substantially from the opportunity to cross-examine Howard under oath and that the evidence arguably lacked substantial guarantees of trustworthiness. At trial, the district court should consider carefully whether to admit it.